CHARLES E. CURTIS, Plaintiff, *v.* McWILLIAMS DREDGING COMPANY et al., Individually and Severally Operated as Greenland Base, Defendants.

CHARLES F. FRENCH, Plaintiff, *v.* McWILLIAMS DREDGING COMPANY et al., Individually and Severally Operated as Greenland Base, Defendants.

CYRIL J. DONOHUE, Plaintiff, *v.* McWILLIAMS DREDGING COMPANY et al., Individually and Severally Operated as Greenland Base, Defendants.

City Court of the City of New York, New York County, February 24, 1948.

*Hyman Korn* for plaintiffs.

*Emil F. Pilz* and *Fellowes D. Gardner* for defendants.

COLEMAN, J. Three former employees of the defendants sue under the Fair Labor Standards Act of 1938 (U. S. Code, tit. 29, § 201 *et seq.*) to recover additional compensation for overtime work and an equal amount as liquidated damages. Three questions are presented: Were the plaintiffs entitled to the benefits of that act? If so, are the defendants relieved from their obligations under that act by virtue of the provisions of the Portal-to-Portal Act of 1947 (U. S. Code, tit. 29, § 251 *et seq.*), which, in certain circumstances, exonerates an employer from liability to pay overtime compensation? And, if the later statute does exonerate the defendants, is it constitutional when applied to these plaintiffs? The period of employment in each case was from 1942 to 1944, and the actions were pending when the Portal-to-Portal Act was passed; no question relating to " portal-to-portal " activities (*Anderson* v. *Mt. Clemens Pottery Co.,* 328 U. S. 680) is involved.

## I.

As to the first question, a statement of the defendants' work and the activities of the plaintiffs in relation to that work is necessary. The defendants, under a cost-plus contract with the War Department, were constructing an airbase for the government in Greenland — a project of large proportions, of course. For administrative and executive purposes they maintained a New York office in which the plaintiffs were employed.

The New York office was responsible for obtaining supplies and materials and for sending them to Greenland. These materials, however, were not brought to New York, but were gathered together at a central point and shipped pursuant to Government instructions and arrangements. The office engaged employees to work in Greenland and arranged for their transportation from their homes, often outside New York, to the New York office and then to Greenland. Among the supplies shipped were a great many articles for commissary use in Greenland. These the office purchased from various places in the United States, had them shipped to the office and arranged for their carriage to Greenland.

At the New York office were kept all the records of materials, supplies, equipment, commissary and wages. Of necessity, there was a constant stream of communication between that office and the persons in charge of the project in Greenland, as well as a stream of men going and coming and of supplies for the personal use of the men in Greenland.

The plaintiff Donohue was a bookkeeper and accountant in the New York office. He performed the duties indicated by the titles themselves. In addition, his duties "included meeting with the groups as they arrived in New York prior to departing for the base sites of operation, processing individual travel expense vouchers for reimbursement purposes; signing of contracts and other documents required of each base employee prior to embarkation, and the recording of these facts in books of record. Also, upon clearing the base forces, upon returning to the United States, in the matter of final settlement of each account."

Plaintiffs Curtis and French were watchmen at the office. Each one of them performed the usual duties of such position "with respect to the good order and safety of the premises, including the duty of making periodic 'rounds' and recording the times of such inspections at established clock stations." On the premises were located not merely the books, records, plans, specifications and correspondence of defendants, but also, as I have said, the supplies purchased at various points in the United States and in process of being shipped to Greenland.

The defendants insist that the plaintiffs are not entitled to the benefits of the act, first because they themselves were not engaged in interstate commerce, and, secondly, because the plaintiffs were not engaged in any work essential to interstate commerce.

At this date in the history of litigation under the Fair Labor Standards Act, neither ground seems to me to be valid. In view of the constant stream of men and materials from the United States to Greenland and return, in view of the need for providing for that transportation, and, for the care and maintenance of the premises, including the watching of supplies kept on them it is idle to assert that the plaintiffs were not entitled to the benefits of the statute (*Phillips Co.* v. *Walling*, 324 U. S. 490, affg. 144 F. 2d 102; *Armour & Co.* v. *Wantock*, 323 U. S. 126; *Skidmore* v. *Swift & Co.*, 323 U. S. 134; *McLeod* v. *Threlkeld*, 319 U. S. 491, 495; *Laudadio* v. *White Const. Co.*, 163 F. 2d 383; *Bell* v. *Porter*, 159 F. 2d 117; *Flaherty* v. *Helmers, Inc.*, 181 Misc. 994, affd. 269 App. Div. 764; *Simkins* v. *Elmhurst Contr. Co.*, 181 Misc. 791, affd. 181 Misc. 793, affd. 268 App. Div. 858). Cases like *Stoike* v. *First National Bank* (290 N. Y. 195), upon which the defendants rely, are not applicable. In the *Stoike* case (*supra*), the work of a porter in cleaning and dusting the office of a bank was thought not to be sufficiently related to, or close enough, to the bank's services in interstate commerce to be part

of these services. So far as Donohue is concerned, he was responsible for the recording of data relating to the interstate and foreign transportation of men and materials. The documents he prepared and the records he kept were as closely related to the movement of men and materials as was the preparation of export bills of lading or charter parties for the shipment of goods to foreign countries or of insurance policies covering such goods. These documents were thought to be so closely identified with the business of exporting itself that a Congressional tax upon them was held unconstitutional (*Fairbank* v. *United States,* 181 U. S. 283; *United States* v. *Hvoslef,* 237 U. S. 1; *Thames & Mersey Marine Ins. Co.* v. *United States,* 237 U. S. 19). '' This paper work was essential to the repairs and alterations made by other employees of the defendants and was, in our opinion, sufficiently closely related to the movement of commerce to justify a holding that the plaintiffs were ' engaged in commerce '.'' (*Laudadio* v. *White Const. Co.,* 163 F. 2d 383, 386, *supra*; cf. *Bozant* v. *Bank of New York,* 156 F. 2d 787.) The other two plaintiffs not only guarded these documents but protected the supplies destined, in regular course, to Greenland. All three plaintiffs come clearly within the act.

## II.

Are the defendants relieved from liability by section 9 of the Portal-to-Portal Act? That section is as follows: '' In any action or proceeding commenced prior to or on or after the date of the enactment of this Act based on any act or omission prior to the date of the enactment of this Act, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.''

The defendants contend that their failure to pay " was in good faith in conformity with and in reliance " upon orders and rulings of the War Department, and upon the policy of that department with reference to the Fair Labor Standards Act; they assert that throughout their dealings with the War Department it was the view of the latter that the Fair Labor Standards Act did not apply to contracting firms doing work similar to theirs or to their respective employees, either because of the nature of the work performed (original construction work), or because the work was being done outside the United States; it was being done on a cost-plus basis so that additional overtime compensation would have to be paid by the Government and the Government is not subject to the act; the services of office employees in this country were only incidental to the main work. Even if these views, the defendants say, may now be found to be " invalid ", nevertheless they relied upon them and, in good faith, acted pursuant to them.

The defense calls for a review of the orders, rulings and correspondence of the War Department.

The contract between the War Department and the defendants was entered into August 27, 1941. It provided, among many other details, for reimbursement to the defendants of all pay-roll expenditures. Circular letter of the department (Finance No. 167) of June 20, 1941, was then in effect; it prescribed the auditing procedure on cost-plus contracts and although it dealt with salaries and payrolls it did not mention overtime. On August 9, 1941, a supplement was issued (Finance No. 167, Supplement No. 2) as follows: " The payment of overtime to cost-plus a fixed-fee contractor's weekly salaried employees is not justified by normal practice and is not permissible." On August 21, 1941, the Office of Division Engineers, North Atlantic Division, wrote the defendants that " no overtime will be allowed to employees paid at a weekly rate of pay " (all three plaintiffs here were paid on a weekly basis); but " compensatory time will be allowed " them " for all time worked in excess of 40 hours a week." Later, October 24, 1941, the provision for " compensatory time " was rescinded. Thereupon the defendants wrote for instructions in a letter prepared for them by their attorneys. They stated " we draw to your attention that in recent months the United States Department of Labor, Wage & Hour Division, under whose jurisdiction comes the administration of the Fair Labor Standards Act, * * * has issued interpretative bulletins bearing upon overtime in the contracting industry. We are advised that such interpreta-

tive bulletins very clearly state that in the opinion of the Wage and Hour Division, many of our personnel who from time to time work overtime are covered by the provisions of the Federal Wage and Hour Law. If that is so, such of our personnel so covered would be entitled to time-and-a-half for overtime."

The response, November 7, 1941, was as follows: " You are advised that no compensation will be allowed for such overtime work either in the form of an equal amount of time off with pay or in the form of extra pay for extra hours of duty."

Upon the receipt of this letter a member of the firm of attorneys representing these defendants and other contractors engaged in similar work for the War Department discussed the matter with the representative of the War Department who had prepared the letter of November 7th; and he was told that it was the considered opinion of the War Department that the Fair Labor Standards Act did not apply to employees of these contractors, including defendants; that it was the policy of the War Department to act upon that view and that the contractors would receive no reimbursement from the Government for any overtime they might pay pursuant to the provisions of that act.

The matter remained in this position until January 5, 1942. Up to that time civilian employees of the War Department had been employed on a forty-hour a week basis and employees of the defendants had also been employed on that basis. On January 5, 1942, the defendants were notified by the War Department that its civilian employees would be placed upon a forty-eight-hour a week basis and " it is requested that you officially establish at once the hours of work for your office to conform with the office hours of the North Atlantic Division." On the same day the defendants were authorized by the War Department to increase the salaries of office employees " in order to com- pensate employees in your New York office for the additional work." The employees of defendant, including the plaintiffs, were thereupon placed upon a forty-eight hour a week basis with a 20% increase in salary; but without reference to the Fair Labor Standards Act for the compensation for the hours in excess of forty. On September 9, 1942, by Executive Order No. 9240 (Code of Fed. Reg., Cum. Supp., tit. 3, p. 1207), the President directed " That the following principles and regulations shall apply for the duration of the war to the payment of premium and overtime compensation on all work relating to the prosecution of the war ". It provided that where an employee because of emergency conditions was required to work for seven consecutive days in a week he should be entitled

to a premium wage of double time compensation for the seventh day, and " (2) Where required by the provisions of law or employment contracts, not more than time and one-half wage compensation shall be paid for work in excess of eight hours in any day or forty hours in any workweek or for work performed on the sixth day worked in any regularly scheduled workweek."

On January 8, 1943, the War Department issued its bulletin (Circular Letter No. 2236, Labor Relations Branch No. 8) calling attention to the fact that the provisions of Executive Order No. 9240 were mandatory and that compliance was required as of October 1, 1942. In drafting this regulation the War Department considered the applicability of the Fair Labor Standards Act to the Executive Order and came to the conclusion that the act did not apply. It authorized the payment of overtime pursuant to the order to groups of employees classified according to salaries and employment. Certain groups were to be paid for overtime work in excess of forty-eight hours a week at a rate of straight time for each hour and double for work on a seventh day; other employees were to be paid overtime only for the seventh day in a week. Some were in no event to receive overtime, and a fifth group was to receive compensatory time off for hours of work above the number of hours which constituted a work week. Obviously, this regulation did not follow the provisions of the Fair Labor Standards Act. And under this regulation, one plaintiff here would have received no overtime pay except for Sunday (at no time did he work on Sunday); and the other two would have received no additional compensation for the eight hours over forty, but they would have been entitled to compensatory time off with pay.

On February 19, 1943, Executive Order No. 9301 (Code of Fed. Reg., Cum Supp., tit. 3, p. 1253) was promulgated. All departments and agencies of the Federal Government were to require their contractors to comply with the minimum work week of forty-eight hours prescribed in the order, but " Nothing in this order shall be construed as superseding or in conflict with any Federal, State or local law limiting hours of work * * * nor shall this order be construed as suspending or modifying any provision of the Fair Labor Standards Act ".

On March 26, 1943, the division engineer, in reply to a letter from defendants, advised them that contrary to the defendants' understanding, the provisions of Executive Order No. 9240 (Sept. 9, 1942) applied to all employees of the defendants employed in this country.

On May 13, 1943, the War Department issued its Circular Letter No. 2390. This contained wage regulations for contractors on a cost-plus basis, for contracts negotiated after May 1, 1943. It covered substantially the same ground as Circular Letter No. 2236 of January 9, 1943, to which I have already referred, and which was applicable to earliest contracts. The May, 1943, letter again divided employees into four classes. For two of these classes salaries were established on the basis of a forty-hour week and for the other two on the basis of a minimum work week of forty-eight hours. Overtime was to be computed at time and one-half for all work over forty hours during the first six days of the week and at double time for work on the seventh day. Other employees were to be paid overtime over forty hours " at the rate of straight time." Some employees were to receive no additional compensation for overtime. Again these provisions did not follow the provisions of the Fair Labor Standards Act; in promulgating it the War Department considered Executive Order 9301 (Feb. 9, 1943) already referred to, and also the act. It believed that Circular Letter No. 2390 complied with the Presidential proclamation; and that the Fair Labor Standards Act did not apply.

In December, 1942, the Wage and Hour Administrator, acting upon a request of the Caribbean Division of the Corps of Engineers for his views as to the applicability of the Fair Labor Standards Act to employees of contractors engaged in the Caribbean area, stated that " the employees in the continental offices of such countries are engaged in interstate commerce or in the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act and are entitled to the benefits of that Act "; unless, of course, they should be exempted as administrative or executive employees. Whether the ruling was intended to apply to cost-plus contractors is not plain — as that question was not considered. According to the Executive Officer of the Chief of the Labor Relations Branch of the Corps of Engineers entrusted with the construction work, " by the time we got around to this report we had already issued Circular Letter 2390 (May 13, 1943) which we thought took care of overtime anyway." Thereafter the War Department had correspondence with the administrator's office; but apparently nothing ensued except a reiteration by the administrator of the views expressed in the interpretative bulletin and the continued insistence by the War Department that the Fair Labor Standards Act did not apply to new construction work whether on a cost-plus basis or on a fixed-fee basis. When the War

Department drafted circular letter No. 2390 it informed the administrator that it was allowing overtime substantially as called for by the Fair Labor Standards Act, but it was not admitting that its contractors were liable to overtime payments under that act. And the administrator acknowledged that this was the position of the War Department.

Three opinions of the Comptroller-General to the Secretary of War should be considered. (1) September 28, 1942, the question was whether a plant manufacturing munitions for the Government on a cost-plus basis contract, was " engaged in production of goods for interstate commerce," and whether certain employees, guards, were entitled to overtime under the Fair Labor Standards Act. The Comptroller-General referred to the fact that the Wage and Hour Administrator had taken the view " that the employees of the private manufacturer (upon a cost-plus basis) are within the general coverage of the Fair Labor Standards Act if the manufacturer, at the time of production, had reason to believe that the War Department, after receiving the products, would transport them in interstate commerce." His conclusion was " if it be administratively determined that the interests of the Government will be best served by conceding that the guards here involved are entitled to overtime pay under the Fair Labor Standards Act, this office will not be required to take issue with that view." The importance of the opinion, however, lies in his quotation from the letter of the Secretary of War which stated: " It seems to be generally conceded by the Ordnance Department, in its Manual of Instructions for the Administration of Contracts, that the Act is applicable." And, further, that " It is the opinion of this office that this policy (of compliance with statutory provisions affecting labor wherever such provisions are applicable) was intended to apply to employees of cost-plus-a-fixed-fee contractors whenever applicable to employees of similar lump sum contractors."

(2) April 27, 1943, in response to a letter of the Secretary of War. The secretary had written: " It has been the understanding of the War Department that non-manual employees of these contractors (the plaintiffs here are non-manual employees) were not entitled to receive time-and-a-half for overtime under the provisions of the Fair Labor Standards Act, and the salary scales hitherto paid such employees have been determined and approved on this assumption." The secretary asked whether, in view of the fact that a number of such employees, i.e., non-manual, had brought suit under the act, employers should be

reimbursed for the amounts paid in satisfaction of any judgment that might be obtained, and for the reasonable cost of litigation. It was the view of the Comptroller-General that employers would be reimbursed.

(3) December 15, 1943, in answer to a letter of November 26, 1943, the Comptroller-General reaffirmed his view that contractors would be reimbursed for litigation expenses, and stated that he would "not be required to object to payments made pursuant to" settlements. In the War Department letter this appears: "In some situations it may be administratively determined to be in the best interests of the Government to authorize the contractor to settle for all or part of the unpaid overtime compensation," and also "that it is the view of the War Department that as indicated in your above-mentioned opinions, such settlements involving more than the full amount of the overtime may be reimbursed to the contractor where made in good faith for the approval of the contracting officer, it having been determined that it is in the best interest of the Government to accept such a settlement rather than contest the claim further."

Certain conclusions emerge from this analysis of the testimony and the records before me. Perhaps in view of the statements contained in the letters of the Secretary of War to the Comptroller-General, we cannot say that there was a consistent policy on the part of the War Department not to recognize claims of employees of cost-plus contractors; although here, too, all one can say is that the department, after litigation arose, did recognize the wisdom of settling certain claims. Perhaps the best we can say is that in certain branches of the War Department the view was entertained that cost-plus contractors were not *ipso facto* exempt from the operation of the act. But it does not appear that the Secretary of War at any time recognized the applicability of the statute to employees like the plaintiffs here and as late as April 7, 1943, it was "the understanding of the War Department that non-manual employees of these contractors [cost-plus-a-fixed-fee contracts] were not entitled to receive time-and-one-half for overtime under the provisions of the Fair Labor Standards Act * * * and the salary scales hitherto paid such employees have been determined and approved on this assumption." The three plaintiffs here were nonmanual employees and it should be recalled that their salaries were adjusted not on the basis of the Fair Labor Standards Act but on the basis of the number of hours actually worked and the kind of work done.

So far as the defendants are concerned their negotiations and dealings were entirely with the War Department.. Employees could be hired by them only after approval by the Corps of Engineers and the salary and wage scale was that approved by the Corps of Engineers. In no event could the defendants be reimbursed by the Government for any wages disbursed unless those payments were in strict accord with the instructions and rulings from the department. If we examine the relations of the defendants to the War Department, we find that although there were doubts in the minds of the defendants as to the applicability of the statute, they were told that overtime would not be allowed under the Fair Labor Standards Act, and the very regulations and orders issued from time to time consistently bear out these instructions. Quite apart from the question as to whether there was any policy of the War Department with relation to cost-plus contractors, it is plain that there were orders and rulings relating to the payment of wages directed to the defendants and that the defendants complied with those rulings.

And, indeed, what was there for the defendants to do? The plaintiffs suggest that there was an absence of good faith on the defendants' part and point to the differences of opinion that developed between the Wage and Hour Administrator and the War Department, especially in reference to the ruling requested by the Caribbean Area Corps of Engineers. It does not appear that that ruling related to cost-plus contractors and it does appear that the Secretary of War at no time deferred to the opinion of the administrator in this respect. The testimony before me indicates nothing more than an exchange of ideas between the War Department and the administrator; and even after the issuance of the administrator's opinion in 1942, the Secretary of War in April, 1943, took a different view of the matter. As between the administrator and War Department, obviously, the defendants had to abide by the rulings of the department with which it was dealing. It could not with impunity act in defiance of those rulings. To repeat the language of the President in approving the Portal-to-Portal Act, the defendants have met " an objective test of actual conformity with an administrative ruling or policy ".

### III.

Since the defense, by the statute, is " a bar to the action," the question of constitutionality must be considered. From the standpoint of the plaintiffs, the act is said to be invalid under

the Fifth Amendment because, reaching back into the past, it deprives them of property, earnings, acquired in the past; and for the defendants it is said that since the plaintiffs' claims to overtime have their source in a statute, the claims may be defeated by a modification or repeal of the statute; " no one has a vested right in a statute." The defendants also rely upon the broad powers of Congress under the " commerce clause," but these powers, however broad, are subject to the Fifth Amendment (*North American Co.* v. *Securities Exchange Comm.*, 327 U. S. 686, 704–705; *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, 589).

We start with the fact that the statute is retroactive in its scope; it attempts to exonerate employers in certain, circumstances from the consequences of having failed in the past to comply with the terms of the act. Of course, retroactive legislation, as such, is not beyond the power of a legislature to enact (*Demorest* v. *City Bank Farmers Trust Co.*, 321 U. S. 36; *Funkhouser* v. *Preston Co.*, 290 U. S. 163). But " The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property * * *. Contracts between individuals or corporations are impaired within the meaning of the constitution whenever the right to enforce them by legal process is taken away or materially lessened." (*Lynch* v. *United States*, 292 U. S. 571, 579, 580.) And so, retroactive legislation calls for justification.

The justification, if any, must be found in the nature of the claims which Congress barred. No justification was expressed in the Congressional statement of findings and policy in part I of the Portal-to-Portal Act. These findings related specifically to " wholly unexpected liabilities " for activities that were strictly " portal-to-portal "; activities otherwise " compensable " are not mentioned.

The plaintiffs' claims are twofold: one, for unpaid overtime compensation and, two, for liquidated damages. The statute does not in terms repeal the earlier act and wipe out the plaintiffs' claims automatically. If it had done so, I do not see how it would have been effective to destroy the claims for unpaid overtime compensation. Section 7 of the Fair Labor Standards Act of 1938 (U. S. Code, tit. 29, § 207) gave the plaintiffs the right to compensation as wages at the rate of time and a half for all hours worked over forty in any one week (*United States* v. *Darby*, 312 U. S. 100, 125). These wages were not received. Week after week they were withheld from the plaintiffs by hypothesis in contravention of the statute. At all times plain-

tiffs could have sued for them and there could not have been any defense to their claims. An outright repeal of the statute retroactive in effect, taking these earned wages from an employee and remitting them for the benefit of the employer, could not, under the Fifth Amendment, avail the defendants in face of the principle that " it is not consistent with due process to take away from a private party a right to recover the amount that is due when the act is passed." (*Graham & Foster* v. *Goodcell,* 282 U. S. 409, 426; cf. *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, *supra; Lynch* v. *United States,* 292 U. S. 571, *supra; Forbes Pioneer Boat Line* v. *Bd. of Comrs. Everglades Drainage District,* 258 U. S. 338.) In the *Forbes* case (*supra*) the court held invalid an attempt by the Florida Legislature retroactively to validate the collection of canal tolls unlawfully collected which the plaintiff was seeking to recover. There too the statute in question was passed while the plaintiff's claim was pending in the Florida courts. " Defendant owed the plaintiff a definite sum of money that it extorted from the plaintiff without right. It is hard to find any ground for saying that the promise of the law that the public force. shall be at the plaintiff's disposal is less absolute than it is when the claim is for goods sold. Yet no one would say that a claim for goods sold could be abolished without compensation." (P. 340.)

It is true that the claims here have their basis in a statute, but it is far from being the case as the defendants assert, that any claim or cause of action created by statute may be defeated by repeal or change in the statute. The nature of the claim and the extent to which one has acquired a cause of action under the statute must be considered (*Coombes* v. *Getz,* 285 U. S. 434). There the California Constitution contained a provision making directors of a corporation liable in certain circumstances to its creditors for debt of the corporation. Creditors brought suit against a director, and while the litigation was pending, the constitutional provision was repealed. The argument was made that since there would have been no liability on the part of the director but for the constitutional provision (a statutory provision, of course, so far as the Fourteenth Amendment is concerned), the removal of this provision prevented a recovery. The creditors relied upon the due process clause of the Fourteenth Amendment and upon section 10 of Article I of the Constitution. The Supreme Court overruled the defendant's contentions. Its language is peculiarly pertinent to the nature of the plaintiffs' claims in these cases, and

disposes of the argument that those claims stand or fall with the continued existence of the statute. "The right of this petitioner to enforce respondent's liability had become fully perfected and vested prior to the repeal of the liability provision. His cause of action was not *purely* statutory. It did not arise upon the constitutional rule of law, but upon the contractual liability created in pursuance of the rule. Although the latter derived its being from the former, it immediately acquired an independent existence competent to survive the destruction of the provision which gave it birth. The repeal put an end to the rule for the future, but it did not and could not destroy or impair the previously vested right of the creditor (which in every sense was a property right, *Ettor* v. *Tacoma,* 228 U. S. 148, 156; *Pritchard* v. *Norton,* 106 U. S. 124, 132) to enforce his cause of action upon the contract." (P. 442.) The content of the due process clause of the Fourteenth Amendment so far as the impairment of substantive rights is concerned is similar, of course, to that of the clause in the Fifth Amendment (cf. *Bowles* v. *Willingham,* 321 U. S. 503, 518; *United States* v. *Darby,* 312 U. S. 100, 125, *supra; Nebbia* v. *New York,* 291 U. S. 502).

*Ettor* v. *Tacoma* (228 U. S. 148), discussed in *Coombes* v. *Getz* (*supra*), was an action under a statute of the State of Washington to recover compensation from a municipality for damage resulting from street grading. There, too, while the action was pending, the statute under which it was brought was repealed. The suit was dismissed in the State courts. The Supreme Court reversed on the ground that the statute destroyed rights which had accrued while the earlier act was in effect. "The obligation of the city was fixed. The plaintiffs in error had a claim which the city was as much under obligation to pay as for the labor employed to do the grading. * * * Nothing remained to be done to complete the plaintiffs' right to compensation except the ascertainment of the amount of damage to their property. The right of the plaintiffs in error was fixed by the law in force when their property was damaged for public purposes, and the right so vested cannot be defeated by subsequent legislation." (Pp. 155–156.)

An employee who had contracted with his employer to work for a year upon a forty-eight hour a week basis, receiving by virtue of the Fair Labor Standards Act time and a half for hours over forty, perhaps could not complain if, during the year, Congress repealed the provision of overtime and for the balance of the term of employment deprived him of the benefits

of the statute. A conventional statement of the principle would be that employer and employee are presumed to have bargained with each other, not only on the basis of existing law, but with the knowledge that that law could be changed (*Coombes* v. *Getz,* 285 U. S. 434, *supra*; *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467; *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349). But for services already rendered the employee had a vested right to his wages. He had earned them and the employer was obligated to pay them to the same extent that the municipality in *Ettor* v. *Tacoma* (228 U. S. 148, *supra*) would have been obligated to a laborer. There was nothing more for the plaintiffs to do under their terms of employment and nothing remained for the employer to do except to pay; and it could not require the continued existence of the statute to give the plaintiffs the power to resort to a court to enforce payment. Here, certainly, is a case relating to transactions " fully consummated in the past," which " are deemed to leave no ground for legislative intervention " (*Graham & Foster* v. *Goodcell,* 282 U. S. 409, 429, *supra*), which are beyond legislative recall.

Is the result different where there has been no outright repeal but a change in the statute to permit a defense which, if effective, has the same result as a repeal? I think not; for the Fifth Amendment looks to the substance of one's rights, and these have been destroyed. An obstacle has been interposed to the plaintiffs' right of recovery where none previously had existed, an obstacle unrelated to the facts which were essential to the creation of the right in the first instance, and which if not removed completely destroys it (*Worthen Co.* v. *Kavanaugh,* 295 U. S. 56; *Lynch* v. *United States,* 292 U. S. 571, *supra*; cf. *Worthen Co.* v. *Thomas,* 292 U. S. 426; *Columbia Ry. G. & E. Co.* v. *South Carolina,* 261 U. S. 236. dealing with impairment of obligations of contracts).

Congress was not attempting to cure a defect relating to the administration of the original act (*Swayne & Hoyt, Ltd.,* v. *United States,* 300 U. S. 297, 302; *Graham & Foster* v. *Goodcell,* 282 U. S. 409, *supra*); nor was it attempting to ratify or to validate what the Secretary of War did in the exercise of presumed authority vested in him by law as in *United States* v. *Heinszen & Co.* (206 U. S. 370), where it ratified, as upon principles of agency, the action of the President in imposing import duties upon imports from the Philippine Islands (cf. *Tiaco* v. *Forbes,* 228 U. S. 549). On the contrary, Congress recognized the possibility — the probability even — of the inva-

lidity of the rulings of the Secretary of War; but it nevertheless adopted the invalidity as the basis not for exonerating him or the Government from liability but for outlawing the plaintiffs' claims against their employers. In effect, what Congress said is this: Whatever the Secretary of War, or, in some other case, the Secretary of the Navy, or the United States Maritime Commission, thought the law was, that will be accepted as the law for a particular employer who had in the past, in good faith acted upon it. Without-inquiry into the power of Congress to confirm the assumed judicial power of statutory interpretation and its exercise by various executive departments, I think we can say that the payment of earned wages for overtime periods in the past cannot be made dependent upon the vicissitudes of interpretation without destroying the substance of the employee's right to receive them.

I have already mentioned that Congress made no express findings as to " compensable activities " similar to those it made for " portal-to-portal " activities. In the absence of findings of an overwhelming public need to deny compensation for work done, courts ought not to rationalize Congressional action in an effort to support that denial. The Fourteenth Amendment may not have enacted Herbert Spencer's Social Statics, but the Fifth Amendment does incorporate the injunction, age-old when the amendment itself was adopted, that the laborer is worthy of his hire.

I appreciate the delicacy of action required on the part of a court in passing upon the validity of the judgment of Congress or of any legislative body. The court seems to be applying scales of its own differently calibrated from those of a legislature in weighing the reasonableness or unreasonableness of a legislature's action. And I know, too, that a court of first instance should be especially concerned not to pass judgment upon the judgment of a legislature. But the case to me, at least, seems clear. Congress was without power to deprive the plaintiffs of the wages they had already earned; whether the power was attempted to be exercised by direct repeal or, as in this instance, by reference to a standard erected by the War Department.

The case stands otherwise as to the plaintiffs' claim for liquidated damages. Here, different considerations apply. The statute fixes the wages to be received and the amount of damages for withholding them. But for this latter provision, the plaintiffs would have been entitled only to interest on the amounts withheld, under the Federal rule as to interest (cf.

*Brooklyn Sav. Bank* v. *O'Neil,* 324 U. S. 697, 715; *Young* v. *Godbe,* 15 Wall. [U. S.] 562). The Fair Labor Standards Act does not authorize payment of interest, as such, but it has provided a substitute, in effect, 100% interest (*Brooklyn Sav. Bank* v. *O'Neil,* 324 U. S. 697, *supra*; *Overnight Motor Transp. Co.* v. *Missel,* 316 U. S. 572). It is plain from these two cases that the Supreme Court considered the double payment not as a penalty or punishment, but as liquidated damages for failure to pay when the wages were due, in lieu of interest; for damages, that it might have otherwise been difficult to determine. "Congress has seen fit to fix the sums recoverable for delay" (*Brooklyn Sav. Bank* v. *O'Neil, supra,* p. 715).

Now the computation of damage for withholding sums due has always been a subject within legislative control even when the Legislature has acted retroactively (*Funkhouser* v. *Preston Co.,* 290 U. S. 163, *supra*). There a change in the New York statute allowing interest where none had previously been allowed for breach of contract, or where the right to recover interest had been in doubt, was held valid even as to a claim that arose before the statute had been enacted. In the court's view there was no impairment of the obligation of a contract. "The ascertainment of that loss [damages for breach of contract], and of what would constitute full compensation, was a matter of procedure within the range of due process in the enforcement of the contract. The statutory allowance is for the purpose of securing a more adequate compensation by adding an amount commonly viewed as a reasonable measure of the loss sustained through delay in payment." (Pp. 167–168.) On the other side, the principle was the same in *Morley* v. *Lake Shore & Mich. So. Ry. Co.* (146 U. S. 162), where the New York statute of 1879 (L. 1879, ch. 538) reducing the legal rate of interest from 7% to 6% was held applicable to a judgment obtained from 1879; from that date interest could be paid only at 6% (cf. *Metropolitan Sav. Bank* v. *Tuttle,* 290 N. Y. 497). In *Standard Oil Co. of Cal.* v. *United States* (107 F. 2d 402) the Circuit Court of Appeals for the Ninth Circuit over objections based on the Fourteenth Amendment sustained a California statute which retroactively denied interest to a prevailing party in an action for conversion in extracting oil or gas where the taking was by one acting "without right but asserting a claim of right in good faith" (p. 417). And in *Missouri & Arkansas Co.* v. *Greenwood District of Sebastian Co.* (249 U. S. 170) a State statute retroactively denying interest

on judgments against municipalities was held not to violate the Fourteenth Amendment.

Indeed, in the absence of statute by Federal rule, the Federal courts, at least, would be free to allow or to withhold interest by reference to considerations of fairness (cf. *Young* v. *Godbe,* 15 Wall. [U. S.] 562, *supra*). In *Royal Indemnity Co.* v. *United States* (313 U. S. 289) the court viewing interest to be the equivalent of damage for delay in payment of an amount due, added that in the absence of statute the trial court was competent to determine the amount of interest for delay as for any other item that went to make up one's damage. Indeed, in *Board of Comrs. of Jackson Co.* v. *United States* (308 U. S. 343) considerations of fairness were thought to be the dominant factors in the allowance of interest.

It was the judgment of Congress that the item of damage heretofore allowed a plaintiff in a suit under the Fair Labor Standards Act should in certain circumstances be disallowed; and the soundness of its judgment on this matter, which, in the absence of statute would be within the discretion of the court and where subject to statute could be varied by statute retrospectively, cannot be inquired into. Congress did not separate the unpaid overtime wages from the liquidated damages, but the two branches of recovery, from a constitutional standpoint, must be treated separately. Certainly, it cannot be said to be arbitrary or whimsical to deny a recovery beyond the strict overtime, where overtime payment was withheld, not willfully or deliberately, or in defiance of the statute, but pursuant to the mature and considered judgment of a department of the Government with which the employer had his dealings, and which more than suggested, if it did not dictate, the terms of employment for its employees. Indeed, under section 11 of the Portal-to-Portal Act, the court itself is given discretion in certain cases to withhold, in whole or in part, liquidated damages where failure to pay the overtime wage was " in good faith " and upon " reasonable grounds for believing " that there was no violation of the earlier statute. The hardship of requiring double payment where the application of the Fair Labor Standards Act to particular circumstances was in doubt, and failure to pay was in good faith, was adverted to in *Overnight Motor Transp. Co.* v. *Missel* (316 U. S. 572, *supra*) but the court recognized it had no discretion. The Eightieth Congress, by section 11, permits the exercise of discretion by the courts in cases thought worthy of it where an earlier Congress was more insistent; and in section 9 it introduces its own rule

of discretion to be followed by the courts (cf. *McCree* v. *United States,* 294 U. S. 23; *Collie* v. *Ferguson,* 281 U. S. 52, on double wages for "waiting time" for seamen; U. S. Code, tit. 46, § 596).

What I have said as to the "double payment" applies at least with equal force to the allowance for attorney's fees. It may be an arbitrary rule of the common law, but it is a rule, nevertheless, that the expense of carrying on a lawsuit is not an item of compensation to the prevailing party (*Oelrichs* v. *Spain,* 15 Wall. [U. S.] 211; *Miss Susan, Inc.* v. *Enterprise & Century Undergarment Co.,* 270 App. Div. 747, affd. 297 N. Y. 512; 1 Sedgwick on Damages [9th ed.], § 229). Attorney's fees may be allowed by statute, but while not rare, its allowance is not usual (cf. Copyright Law, § 40 [U. S. Code, tit. 17, § 40]; General Corporation Law, § 61-a, now embodied in § 64) and the power to deny interest or damages by way of interest from a recovery includes the power to deny attorney's fees as an item of recovery, even retroactively (cf. *Yeiser* v. *Dysart,* 267 U. S. 540, 541; *Calhoun* v. *Massie,* 253 U. S. 170).

The plaintiffs, therefore, are entitled to recover only the overtime wages unpaid. These amounts have in substance been conceded by the defendants as a matter of computation; and on the basis of those computations the plaintiffs will have judgment as follows: Curtis, $933.71; French, $962.84; Donahue, $515.23. Normally, the plaintiffs suing for unpaid wages would be entitled to interest under the New York statute (Civ. Prac. Act, § 480), but since the Portal-to-Portal Act of 1947 governs and Congress intended to relieve the defendants from all liability, except where it was beyond its power to do so, there can be no interest. The plaintiffs, however, may include costs under the New York statute. This allowance, of course, is a matter of local practice, and there has been no attempt on the part of Congress to legislate upon this point.