**LASSITER et al. v. GUY F. ATKINSON CO. et al. and five other cases.**

Nos. 12017, 11983, 11985, 11984, 11986, 12018.

United States Court of Appeals
Ninth Circuit.

Aug. 24, 1949.

Oscar A. Zabel and Frederick Paul, Seattle, Wash., for appellant Naylor.

Wettrick, Flood & O'Brien, Seattle, Wash., for appellant Tyler.

McMicken, Rupp & Schweppe, Mary Ellen Krug, Seattle, Wash., for appellants Kohl and Sessing.

Frederick Paul, Seattle, Wash., for appellants Lassiter, Morrison and McNally.

Maurice R. McMicken, Seattle, Wash., for appellee West Const. Co.

Allen, Hilen, Froude & DeGarmo, Gerald DeGarmo, Seattle, Wash., for appellees S. Birch & Sons and Morrison Knudsen Co.

Bogle, Bogle & Gates, Robert W. Graham, Seattle, Wash., for appellee Guy F. Atkinson Co.

Tom C. Clark, Atty. Gen. of U. S., H. G. Morison, Asst. Atty. Gen., J. Charles Dennis, U. S. Atty., Seattle, Wash., Enoch E. Ellison, Sp. Asst. to Atty. Gen., Johanna M. D'Amico, Atty. Dept. of Justice,

Washington, D. C., Frank A. Pellegrini, Asst. U. S. Atty., Seattle, Wash., for U. S. A. as intervenor.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

These are consolidated cases in which certain employees of the appellee construction companies brought suit against their employers for overtime wages, liquidated damages, and attorneys' fees, pursuant to section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b). The work for which claims were made was performed in 1944 and 1945. Judgments were entered in favor of the claimants by the District Court of the United States for the Western District of Washington, Northern Division, whereupon the employers appealed to this court. After argument, but before decision (except in one case),[1] we remanded the causes to the district court, on the employers' motion, in order to permit the employers to proffer pleadings under the then recently passed Portal-to-Portal Act of 1947, 29 U.S.C.A. §§ 251–262. On March 2, 1948, after a trial, the district court made findings and dismissed the actions on the ground that the employers had pleaded and proved defenses under Sections 9 and 11 of the Portal-to-Portal Act.

Appellants assert that Sections 9 and 11, as applied to them, are unconstitutional. The constitutionality of the Act has been upheld by the Courts of Appeals of seven circuits, including this one. See Thomas v. Carnegie-Illinois Steel Corp., 3 Cir., 174 F.2d 711, and cases cited. Two of the cases there cited dealt specifically with Sections 9 and 11. Rogers Cartage Co. v. Reynolds, 6 Cir., 166 F.2d 317; Darr v. Mutual Life Ins. Co., 2 Cir., 169 F.2d 262, certiorari denied 335 U.S. 871, 69 S.Ct. 166. These sections are valid.

These appeals present the question whether the district court was justified in finding that the employers did plead and prove, as provided by Section 9, that their failure to pay overtime was (1) in good faith in conformity with and in reliance on (2) any administrative regulation, order, ruling, approval or interpretation (3) of any agency of the United States.[2]

Consideration of the evidence is greatly simplified by the stipulation made by all parties that all evidence, documentary or oral, relating to any one of the defendants should be deemed to relate to all defendants, and that all information, knowledge, beliefs and actions of any of the defendants should be deemed to be that of all other defendants.

The claimants worked for their employers in the construction of certain Aleutian Island air bases during the war. The employers, as cost-plus-fixed fee contractors, had been engaged by the United States. One of the employers, the Guy F. Atkinson Company, referred to here as Atkinson, began the performance of construction work in Alaska under contract with the War Department, in August 1942. In the performance of this contract no overtime was paid for work up to 44 hours in a work-week in Seattle or up to 48 hours in a work-

---

1. Opinion in Lassiter v. Guy F. Atkinson, No. 12017 on this appeal, then No. 11312, was filed May 28, 1947, 162 F.2d 774, but that judgment was vacated when the cause was remanded. 166 F.2d 144.

2. "In any action or proceeding commenced prior to or on or after May 14, 1947 based on any act or omission prior to May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healy Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect." Act of May 14, 1947, c. 52, § 9, 61 Stat. 88, 29 U.S.C.A. § 258.

week in Alaska. By the Wage Stabilization Act, 50 U.S.C.A.Appendix, § 961 et seq., and Executive Order 9250, 50 U.S.C.A.Appendix, § 901 note, the wages and salaries of employees were frozen as of October 3, 1942. In September, 1943, Atkinson entered into a new contract for other similar work with the War Department. While it was being negotiated, Atkinson was advised that it would be expected and required to follow the provisions of certain circular letters from the Office of the Chief of Engineers, War Department. These circular letters concerned the wage policy for non-manual employees. All of the claimants were in this category, and all were classified by the War Department as "Group 'B' " employees, a classification explained by the following excerpt from one of the circular letters, which was dated January 9, 1943:

"5. Requirements as to hours of work, overtime and leave allowances for non-manual employees of cost-plus-a-fixed-fee principal and subcontractors:

\* \* \* \* \* \*

b. For this purpose, non-manual employees will be classified in the following groups:

\* \* \* \* \* \*

"(2) Group 'B'. Employees whose base salaries are between $50.00 and $90.00 per week, inclusive, except those included in groups 'D' and 'E'.

\* \* \* \* \* \*

"C. The base salaries of all employees of Groups 'A', 'B', and 'C' will be established on the basis of a minimum work week of 48 hours.

\* \* \* \* \* \*

"e. Group B employees will be expected to work any reasonable number of hours six (6) days per week, without payment of additional compensation. They will be paid at the rate of two times straight time (the weekly salary divided by 48) for all work which they are required to perform on the seventh consecutive day."

Attached to the employers' contracts with the War Department were copies of the uniform employment contracts which the government required them to use in employment of personnel. Provisions in these contracts relating to hours of work and overtime compensation were the same as required by the circular letter quoted above. The employers' contracts relating to the work in Alaska provided: "It is contemplated that work at the site will be carried out on the basis of two 10 hour shifts a day, 7 days a week." It is conceded by all parties that the employers and the War Department officials never deviated from the terms of these contracts, or from the directions of these circular letters in their policies concerning overtime payment.

The requirement of a work-week of seven ten hour days for non-manual employees, with overtime compensation to be paid only for work on the seventh day, and the freezing of wages, created a disparity between the gross earnings of such workers and manual employees who were allowed more overtime compensation. The resultant dissatisfaction created a serious personnel problem for the employers. Much of the subsequent correspondence should be read with this in mind.

The Corps of Engineers maintained a close control over all phases of the employers' operations. The officer whom that organization delegated to represent it with the employers was known as the Contracting Officer. Before entering upon the instant contract, Atkinson had received a letter from the Chief of the Personnel Branch of the Corps of Engineers bearing on its relation to the Contracting Officer. That letter stated in part:

"1.a. Problems frequently arise under cost-plus-fixed fee contracts as to the applicability or interpretation of laws or Executive Orders affecting the labor costs of the contractor.

"b. Such problems have in the main been submitted for determination through the Contracting Officer in the case of private plants operating under cost-plus contracts or through the Commanding Officer of Government-owned, privately-operated plants. However, some contractors have submitted such problems direct to civilian agencies without clearance through the War Department.

"c. Since the War Department is responsible for the reimbursement of proper labor costs under these contracts, all such problems will be submitted through the Contracting or Commanding Officer. Such procedure should govern problems under Executive Orders Nos. 9240, 9250, and 9301; Fair Labor Standards Act; Walsh-Healey Act; Davis-Bacon Act; Copeland Act; 8 Hour Law; and other laws or orders past or future affecting labor costs.

"2.a. If a ruling is required from a civilian agency it will be obtained by or through the War Department..

Shortly after the contract was signed, Atkinson prepared organization charts and wage schedules which included regulations relating to overtime pay and submitted them to the Contracting Officer for approval. These contained the job descriptions of the claimants and were submitted for wage stabilization purposes. These job descriptions were concise; one of claimants was an assistant accountant and his job was described thus: "Under the direction of the accountant, supervises one or more of the functions of the accounting department." However, it was shown on the earlier trial of this case that the work actually performed by the claimants differed from the job descriptions to such an extent that if the Fair Labor Standards Act applied to the work generally, they would be brought under the Act rather than within the exemption extended to administrative employees.

In submitting these schedules Atkinson called attention to the disparity in pay mentioned above, and which was reflected in the schedules, and suggested the necessity of obtaining adjusted schedules that would permit it to secure and retain necessary administrative and supervisory personnel.

In November, 1943, these organizational charts and schedules and pay policies were approved by the Contracting Officer and as a result of suggestions contained in the letter of approval Atkinson undertook to present to the War Labor Board and the Salary Stabilization Unit requests for wage and salary increases and adjustments. With the approval of the Contracting Officer Atkinson employed counsel to present such requests on behalf of all Alaskan contractors. Nothing came of these efforts. The War Labor Board was uncertain as to its jurisdiction and the Salary Stabilization Unit advised that it would not accept a joint submission and that it would be necessary for each contractor to submit a separate application. Because of the delay which had already resulted without a decision as to the wage scales to be employed, a conference of military and civilian officials was held at Seattle, as a result of which Atkinson was advised that if the application were submitted to the office of the Secretary of War, it would assume jurisdiction to determine the problem through the War Department Wage Administration Agency.[3] As a result, Atkinson withdrew the applications to the War Labor Board and Salary Stabilization Unit and submitted all material to the Contracting Officer.

This submission resulted in the so-called "Abersold directive", issued April 27, 1944, by John R. Abersold, Chief of the War Department Wage Administration Agency. It was addressed to the Commanding General, Alaska Department, and copies were transmitted to Atkinson by the Contracting Officer.[4] Express approval was given to

3. It appears that the War Department construed the War Labor Board's General Order No. 14, (29 C.F.R.Cum.Sup. § 803.14, 7 F.R. 9861), dated November 26, 1942, to delegate to the War Department Wage Administration Agency power to rule upon such applications for wages and salary adjustments.

   A similar delegation was made by the Commissioner of Internal Revenue, 10 C.F.R.Cum.Supp. § 81.977 aaa.

4. The directive purported to be issued "under authority granted to the War Department Wage Administration Agency in connection with Executive Orders No. 9250 and No. 9328, 50 U.S.C.A.Appendix, § 901 note, by the National War Labor Board (General Order No. 14) and by the Commissioner of Internal Revenue (Letter of 24 December, 1942)." See note 3, supra.

enclosed salary schedules and statements of policy governing non-manual employees. The part relating to employees in Alaska recited: "The Agency has examined the rates which the contractors have been paying their employees between 15 September, 1943, and the date of this ruling and hereby approves those rates for such employees." Enclosed was a statement of policy which recited: "Group 'B' employees will be expected to work any reasonable number of hours six (6) days per week, without payment of additional compensation. They will be paid at the rate of two times straight time for all work which they are required to perform on the seventh consecutive day worked in the scheduled work week." Similar statements were made in the portion of the directive relating to the Seattle headquarters employees. Thus the wording of the directive relating to overtime payments was substantially that of the circular letter, quoted above, and of the uniform employment contracts prescribed by the War Department contracts. The employers complied with this directive.

In the meantime, and before the receipt of the Abersold directive, Atkinson had addressed requests to the Contracting Officer seeking opinions or rulings with respect to overtime payments. On December 23, 1943, it inquired whether premium rates for work in excess of 40 hours per week should be paid under its contract. In reply, that officer, on April 13, 1944, wrote:

"In answer to the second question, there is no reason why premium rates should have been paid for work in excess of 40 hours per week unless the work came under the jurisdiction of the Fair Labor Standards Act. Many highly trained legal minds have pondered this question without arriving at a satisfactory conclusion. Obviously, the Chief of Engineers did not believe the Fair Labor Standards Act applied because the initial policy was that only straight time overtime be allowed for work in excess of 48 hours per week and then only to the lower grade employees. Grade B employees were allowed no overtime at all during the first six days of the week.

"Circular letter No. 2390 is the result of this continuous argument about the application of the Fair Labor Standards Act. The wage and hour people claimed that it did apply and no authoritative answer could be obtained, so the legal staff of the Chief of Engineers effected a compromise acceptable to the wage and hour people. This provided pay for the lower bracket employees in conformity with the provisions of the Act, but did not accept the application of the Act over-all, as demonstrated by the straight-time overtime provisions of Grade B employees. The only explanation of this is that it was a compromise agreement that such employees were semi-supervisory. The Act exempts supervisory employees, but nothing is said about semi-supervisory employees, so the debate is still unsettled. The compromise did obtain the assurance that the wage and hour people would not press claims under the Act because of failure to pay time and a half overtime for the B Group.

"Your third question is answered by the above, except that the mandatory part is derived from the directive of the Chief of Engineers that contracts negotiated after May, 1943, shall use the compromise agreement."

On February 12, 1944, the employer, referred to as Birch-Morrison-Knudsen, was advised by the Contracting Officer that "overtime pay shall be in accordance with the Chief of Engineer's circular Letter 2390, copy of which has already been furnished to you." On February 13, 1944, the same employer was advised, by the same officer, that "no overtime benefits shall accrue on the first six days." On March 18, 1944, Atkinson, by letter to the Resident Engineer in Alaska, suggested that it interpreted the "reasonable number of hours" (mentioned in the circular letter), its Group B employees were expected to work, as eight hours, and that, since such employees were working 10 hours, they should be entitled to overtime payments for the extra two hours. To this the Officer replied: "Payment of overtime compensation to Group B non-manual employees would be in violation of Executive Order No. 9240

* * * Accordingly, this headquarters cannot approve the request * * *"

The documents and correspondence to which we have thus far alluded disclose a uniform and consistent policy on the part of everyone connected with the War Department who had to do with these contracts. This attitude continued throughout, and never varied.

Because of the requirement contained in the letter of instructions from the Chief of the Personnel Branch, Corps of Engineers, quoted above, that problems relating to labor costs should not be submitted to civilian agencies without clearance through the War Department, and that "all such problems will be submitted through the Contracting or Commanding Officer", the employers had little contact with any civilian agency, but they did have some. This was with the Wage and Hour Division of the Department of Labor. Three such contacts are disclosed by the record.

The first was in May, 1944, when an inspector of the Wage and Hour Division of the Department of Labor visited the offices of Atkinson and told an official of that organization that the overtime as paid in certain instances was not in accordance with overtime prescribed by the Fair Labor Standards Act; that he did not know whether Atkinson was under the Act or not, and that the matter of the War Department's handling of the administration of such questions with the Department of Labor was something that he would have to refer to his superiors for opinion since it was not his province to express opinions.

The next occasion was when Atkinson received a letter from the Seattle Branch Manager of the Wage and Hour Division dated September 19, 1944, notifying it that, "Inasmuch as certain violations of the Fair Labor Standards Act have been disclosed in a recent inspection of your operations, it becomes necessary to ask you to compute overtime due certain employees."

Atkinson referred the matter to the War Department, and in October, 1944, the Contracting Officer notified it that it would be advised as soon as definite instructions were received. Nothing further was heard directly by appellees from either the War Department or the Wage and Hour Division.

In November, 1944, an employee of one of the contractors wrote his senator, Kenneth S. Wherry, of Nebraska, complaining that he had not been paid proper overtime during his work in Alaska. The Senator referred this letter to L. Metcalf Walling, the Administrator of the Wage and Hour Division, who replied:

"* * * It is my opinion that employees of construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across state lines. Thus, I believe the employees whose work occupied them in the original construction of buildings are not generally within the scope of the Fair Labor Standards Act * * *

"* * * It is my recommendation that since no claim has been made by your constituent to entitlement of overtime compensation by reason of a federal law that you seek advice from the War Department, Office of the Chief of Engineers."

This correspondence was brought to the employers' attention.

In February, 1945, employees of appellees filed certain claims which again focused the attention of the employers upon the application of the Fair Labor Standards Act to their employees. These claims were referred to the War Department which replied, through the Contracting Officer, "After carefully considering the validity of the claims, it is the decision of the Contracting Officer that favorable action is precluded by existing War Department policies. The claims are accordingly denied in their entirety".[5]

5. No effort has been made to list all the communications received by the employers. Those here discussed are fairly representative of others to the same effect. Thus, the one from which quotation is here made, was preceded, during the same month, by one sent Atkinson by the same officer, in which, after referring to one of the circular letters mentioned above, the officer wrote: "In view of these instructions, claims based on alleged violations of the Fair Labor Standards Act shall continue to be denied by the Contracting Officer."

The documentary evidence to which we have referred was supplemented by oral testimony on behalf of the employers (1) that none of the employers believed that their operations were covered by the Fair Labor Standards Act, (2) that no one to whom the schedules prepared for the War Labor Board and the Salary Stabilization Unit were submitted ever advised that the rates of pay therein were in violation of that Act, (3) that their own attorneys had advised that new construction, such as this, was not covered. It was testified: "In this connection we depended upon the War Department and their Labor Relations Section and their legal advisers to advise us upon the applicability of all regulations in connection with this work,—partly as our own policy and partly because that is specified in our contract.

"Every feature of our employment and employment conditions was directed by the War Department representatives. We were given no latitude in that regard and the War Department, we considered, was able and obligated to inform and instruct all CPFF contractors on that problem."

Appellants' first assertion is that the acts of the employers were not "in reliance on any administrative regulation, order, ruling, approval or interpretation, of any agency," but solely and only in reliance on and in conformity with their War Department contracts. It is pointed out that "contracts" are not listed in the quoted phraseology, and it is argued that the omission is significant. It is said that the employers' only concern was that they should comply with the contracts in order that they might obtain reimbursement of all expenditures; that compliance with the Fair Labor Standards Act was a matter of indifference to them, and that they did not seek or obtain any ruling referring specifically to the application of that Act.

While it is true that such rulings as were obtained from the War Department invariably directed an overtime policy which conformed to the contract requirements, yet it is to be noted that the employers continued to canvass the question of additional and overtime payments, and did not content themselves with a mere examination of their contracts. We have mentioned the inquiry of December 23, 1943, respecting premium rates for work in excess of 40 hours, and the reply thereto; the inquiry of March 18, 1944, with respect to overtime payments for the extra 2 hours included in the ten-hour day, followed by the refusal of approval. The Abersold directive was of like character. These are all rulings upon which the employers testified that they relied.

It cannot well be urged that the War Department and its subdivisions issuing the various communications, the Corps of Engineers, the Contracting Officers and the War Department Wage Administration Agency, were not "agencies of the United States" within the meaning of the Portal-to-Portal Act. The authority to act with the sanction of government behind it determines whether or not a governmental agency exists. The form the agency takes, or the function it performs are not determinative of the question of whether it is an agency, although it may be significant with respect to other questions, such as "good faith", or whether there is an "administrative regulation, order, ruling, approval, or interpretation."[6]

6. The Administrative Procedure Act, 5 U. S.C.A. § 1001(a) defines agency as "each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia." And it has been held that the Veterans Administration is an agency of the United States, Sanchez v. U. S., 1 Cir., 134 F.2d 279, 283; that the Federal Housing Administration is an agency of the United States, Korman v. Federal Housing Administrator, 72 App.D.C. 245, 113 F.2d 743, 745; that the United States Shipping Board was an agency of the United States, Cohn v. United States Shipping Board, 6 Cir., 20 F.2d 56, 59; that national banks are agencies of the United States, Posadas v. National City Bank, 296 U.S. 497, 56 S. Ct. 349, 80 L.Ed. 351; and that an Army Post Exchange is an agency of the Federal government, Standard Oil Co. of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611. See Rogers Cartage Co. v. Reynolds, 6 Cir., 166 F.2d 317, page 320, footnote 1.

While some of the appellants concede that the War Department, the Corps of Engineers, and the War Department Wage Administration Agency were "agencies of the United States", other appellants urge that the communications from the Contracting Officer cannot be said to have been promulgated by such an agency. Since the War Department's action was necessarily vicarious,—it could speak only through some individual,—and since the letter of instructions which preceded the work, and from which we have quoted, recited that "all such problems will be submitted through the Contracting or Commanding Officer", it would appear that when the Contracting Officer spoke, he spoke for the War Department, and as its authorized representative.

The contention that not one of the various communications placed in evidence by the employers was an "administrative regulation, order, ruling, approval or interpretation", appears to be negatived by the legislative history of the Act. A study of the Congressional debates and reports during the consideration of the bill which resulted in the Portal-to-Portal Act convinces us that the Act was intended to cover a situation such as that here presented.[7]

■ We think these communications came within the language of the act. The interpretation of the phrase "administrative regulation, order, ruling, approval or interpretation" by the New York Supreme Court in Semeria v. Gatto, 75 N.Y.S.

2d 140, 143 that "the terms * * * imply a command or direction authoritatively given for a general course of action, applying to all alike" seems to us patently fallacious. Nor do we believe our holding is contrary to that of the Court of Appeals for the Eighth Circuit in Fred Wolferman, Inc., v. Gustafson, 169 F.2d 759, which held that the mere dismissal by the Administrator of his appeal from denial of an injunction against alleged violations of the Fair Labor Standards Act was not an "administrative interpretation" under the Portal-to-Portal Act.

■■ It is said that the Administrator of the Wage and Hour Division interprets this phrase otherwise than do we. His interpretations are entitled to some weight, Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124, but are not controlling. It seems to us that an agency of the United States, the War Department, has said to these employers: "You will not pay these men overtime compensation", and "this department will handle any problems arising under the Fair Labor Standards Act and you must present any such problems to us rather than to any civilian agency". This prescribes a course of conduct to be followed in the future emanating from some one with apparent authority so to prescribe. In our view this would seem to fall within the purview of the phrase "administrative regulation, order, ruling, approval, or interpretation". While the

7. Representative Walter, one of the Conference Committee, stated during House consideration of the Conference report: (Congressional Record, May 1, 1947, Vol. 93, p. 4515) "Of course, during the war there were a great many rulings made by people who were not connected with the Wage and Hour Division, but certainly during those trying times when a contractor was endeavoring to follow out the instructions of his government, if he received instructions from somebody in a position of authority, then if those instructions resulted in his violating the law that man should have a defense. So we decided to treat this question of good faith in two ways, one, as to existing claims, and two, as to future claims.

As to existing claims it was decided that where an employer in good faith acted on the ruling of an official, apparently acting within the scope of his authority that employer could set up the instructions thus received as a defense, and incidentally an affirmative defense, and if he could prove it then he was relieved from liability."

The Conference Report recited, with respect to Section 9: (Congressional Record, April 29, 1947, Vol. 93, p. 4372) "It will thus be seen that the administrative regulation, order, etc., does not have to be in writing nor does it have to be a regulation, order, etc., of the Federal agency which administers the act in question. It will be sufficient if the employer can prove that his act or omission was in good faith in conformity with and in reliance on an administrative regulation, order, etc. of any Federal agency."

Act should be strictly interpreted, (because of the substantial rights which it impairs) still it is remedial legislation and it must be interpreted with this in mind lest we do violence to the intent of Congress.

The most serious question raised by claimants, we believe, is whether the employers have proved that their omission to pay overtime was "in good faith in conformity with and in reliance on" the above communications. There is little doubt that those communications were relied on and conformed with, but the question of "good faith" remains. "Good faith" has not been defined by the Act. It is thus left to the courts to ascertain what it means as used here. Since it is a phrase common in the law it has often been judicially defined in its various settings.[8]

Whether the employers here acted in good faith is essentially a question of fact. This fact has been found by the trial court. Under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., we are prohibited from setting this finding aside unless it is "clearly erroneous". Appellants say that the court's finding upon this point was necessarily arrived at by way of inference or conclusion drawn from the whole record, and since that record is almost entirely one of written documents, this court is not bound to accept the district court's finding of good faith, but should determine the question independently. If we do this, it is said, we must find good faith wanting.

It is our opinion that a determination of whether the employer recipients of the welter of orders, directives, instructions and other communications which are shown in the record were acting in good faith must be arrived at by application of the standard of "the reasonable man", and that notwithstanding the predominantly documentary character of the evidence, we are necessarily dealing with a question of fact. If, on the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed",[9] it is our duty to reverse the finding. On the other hand, if we are satisfied that the proof was sufficient to warrant the court's inference that the employers acted in good faith, if we cannot say that the finding was "clearly erroneous", we cannot set it aside.

Appellants point to the various references to or communications from the Wage and Hour Division, and say that thereby the employers were put on notice that this division considered these employees entitled to overtime under the Fair Labor Standards Act. They argue therefore that the employers deliberately chose to comply with the rulings they best liked, or which caused them the least trouble, and that this negatives good faith on their part. They say that such rulings as the Abersold directive were not issued in response to any request for a ruling as to the application of the Fair Labor Standards Act, that it resulted from a request for wage stabilization relief, and that the factual data upon which the War Department proceeded was inaccurate and insufficient since the job descriptions furnished the War Department indicated that the employees in question held exempt administrative positions, whereas their actual work took them out of any exempt category. Therefore, it is said, the employers, who are charged with knowledge of the work actually done, could not in good faith rely upon communications from officials whose only knowledge was obtained from the job descriptions. Appellants say further, that although the employers had been advised that problems relating to labor costs could be submitted to civilian agencies "through the Contracting or Commanding Officer",

---

8. Moore v. Commissioner of Internal Revenue, 2 Cir., 101 F.2d 704, 706: "As long as it sufficiently appears that the taxpayer did not act with a view to 'defeat the intent and purpose' of the tax law, the good faith requirement is satisfied." Kiyoichi Fujikawa v. Sunrise Soda Water Works Co., 9 Cir., 158 F.2d 490, 494:

"Good faith includes, not only personal upright mental attitude and clear conscience, but also intention to observe legal duties."

9. United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L. Ed. 746.

they showed lack of good faith in failing to request that the War Department submit the specific question of the application of the Fair Labor Standards Act to the Wage and Hour Division, which was the agency charged with administration of the Act.

Appellants place special emphasis upon the Contracting Officer's letter of April 13, 1944, parts of which are set out above, in which it was related that the War Department and the Wage and Hour Division disagreed as to whether the Act applied, and upon the letter from the Seattle Branch Manager for the Wage and Hour Division, stating that violations of the Act had been disclosed on inspection of the employers' operations.

Much of the argument of appellants is predicated upon the assumption that the record shows that the communications of the War Department officials and the positions taken by the employers were bottomed upon a concession that the Fair Labor Standards Act applied to the operations generally, but that these Class B employees were not covered solely because they were in an exempt category as administrative employees. We think that the record does not so show.

There was substantial evidence that the employers did not believe that the Act applied to any jobs on these contracts. They had sought the advice of counsel through the National Contractors Association, and were advised "that new construction was not covered". This was in accord with the opinion expressed by the Administrator of the Wage and Hour Division in his letter to Senator Wherry that "I deem it advisable to point out also that it is my opinion that employees of construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across state lines. Thus, I believe that employees whose work occupies them in the original construction of buildings are not generally within the scope of the Fair Labor Standards Act even if the buildings when completed will be used to produce goods for commerce. The Act applies, you will recall, only to those employees who engage in interstate commerce, produce goods for interstate commerce, or are necessary to the production of such goods."

The letter of the Contracting Officer, of April 13, 1944, previously quoted, which stated that "many highly trained legal minds have pondered this question without arriving at a satisfactory conclusion", stated that the Chief of Engineers did not believe that the Act applied. The letter gave the employers to understand that an agreement had been reached with the Wage and Hour Division, but clearly stated that this was not on the assumption that the Class B employees were exempt as supervisory,—they were stated to be "semi-supervisory",—and as such not listed as exempt by the Act.

That the employers in fact believed that the Act did not apply to these employees, regardless of the nature of their work, is evidenced not merely by their testimony to that effect, but by their conduct. They were having a difficult time holding their non-manual help, and sought in various ways to think up plans under which they could pay overtime. This accounts for the repeated requests for rulings, such as the one of March 18, 1944, suggesting a payment of overtime for 2 hours out of each ten-hour day. It was testified that the plan proposed originated with Atkinson's Job Manager Skeel, and that it was prompted by the fact that "the company was having difficulty manning the work under his immediate supervision because of the inequities of the non-manual schedule". It seems apparent that in this situation, with Atkinson and the others attempting to get leave to pay more overtime, had they supposed the Fair Labor Standards Act applicable here, they would have made more specific reference to it, instead of spending their efforts upon plans such as this of Skeel.

We think the court was justified in believing the testimony on behalf of the employers that they did not believe that they were subject to the Act, and that it was their understanding that the Act did not apply to the activities of the companies or their employees in the performance of

these contracts. Whether the Act did apply was not entirely free from doubt.[10]

We also think that the court had sufficient grounds for finding that the employers were justified, as reasonable men, in believing that the numerous directions of the War Department as to overtime payments at rates entirely inconsistent with those which the Fair Labor Standards Act would require, were sufficient to furnish assurance that they could safely disregard the provisions of that Act. We think that such an assurance was implied in those communications notwithstanding most of them contained no express reference to the Act. The court may well have considered the employers were acting reasonably when, as expressed by a witness for the employers, and quoted above, they "depended upon the War Department and their Labor Relations Section and their legal advisers to advise [them] upon the applicability of all regulations in connection with this work."

Nor can we find it necessary to find want of good faith in the failure of the employers to ask the Contracting Officer to submit specific inquiries to the Wage and Hour Division. The instructions received from the Chief of the Personnel Branch, Corps of Engineers, in which the employers were told, "If a ruling is required from a civilian agency it will be obtained by or through the War Department", could be interpreted, after careful study, to be a suggestion that a request for ruling be forwarded to the Wage and Hour Division through the Department. But we do not think it would necessarily carry that meaning to the contractors. To them, its main import would more likely be, that they were directed not to submit these problems "direct to civilian agencies" as some contractors had done.

■■ Atkinson evidently so construed the letter, for when the Seattle Branch Manager for the Wage and Hour Division wrote his letter of September 19, 1944, referring to "certain violations of the Fair Labor Standards Act", the letter was promptly forwarded to the War Department. Although the author of the letter testified that he had no authority to initiate opinions, the fact that it was received

10. The conclusion of the court below upon the first trial of these cases that these employees were engaged in interstate commerce was based upon the finding that as office employees they were engaged in processing the transportation of the workmen on these bases, who were recruited in the states and transferred to the jobsites in Alaska, and again returned on completion of work. The theory of the court was similar to that adopted in Curtis v. McWilliams Dredging Co., City Ct., 78 N.Y.S.2d 317, 321, where the court referred to a "constant stream of men and materials from the United States to Greenland and return".

The disposition which we here make of these cases makes it unnecessary for us to decide whether the district court was correct in so holding, whether the activities of these employees were "actually in or so closely related to the movement of the commerce as to be a part of it." McLeod v. Threlkeld, 319 U.S. 491, 63 S. Ct. 1248, 1251, 87 L.Ed. 1538.

Since May 28, 1946, when those findings of the lower court were made, there have been a number of decisions with respect to application of the Fair Labor Standards Act to original construction of War and Navy Department facilities in cases where the employees must have been recruited and moved in and out in the same manner as in this case. Holding that the Act does not apply in such cases are Maitrejean v. Metcalfe Construction Co., 8 Cir., 1948, 165 F.2d 571, (construction in Alaska); McDaniel v. Brown & Root, Inc., 10 Cir., 1949, 172 F. 2d 466 (construction of Naval Ammunition Depot); and Reed v. Murphey, 5 Cir., 1948, 168 F.2d 257 (construction of Navy camp in Mississippi). Note the comment upon this case, and upon the action of the Supreme Court in dismissing the actions of the construction employees, Murphey v. M. T. Reed, 335 U.S. 865, 69 S.Ct. 105, in note 4 in the McDaniel case, supra, at page 471 of Vol. 172 F.2d. An interesting subject of speculation is the as yet undecided question whether the effect of the various war-time enactments "was to set up a wholly new system of war production, which was neither private enterprise nor government operation, but an amalgamation of the two, which also prescribed a complete system of labor relation by statute which supersedes and precludes operation of the Fair Labor Standards Act." See Kennedy v. Silas Mason Co., 334 U.S. 249, 255–256, 68 S. Ct. 1031, 1034, 92 L.Ed. 1347.

has some bearing upon the question of the employers' good faith. But a few days later the Administrator wrote the letter expressing the opinion that employees of construction contractors generally were not covered. As the record stands, we cannot find in the fact of the receipt of the Branch Manager's letter, or in the failure of the War Department to make direct reply or further ruling after the letter had been referred to it, or in the fact that the employers did not require the War Department to submit the question of overtime payments to the Wage and Hour Division, circumstances that require a determination of lack of good faith. We have carefully considered all of the facts which appellants assert negative good faith. It is our opinion that the determination of the trial court was sustained by substantial evidence. We cannot declare the finding of good faith "clearly erroneous".

Evidently the trial court considered that Atkinson's officer in charge of operations was drawing a correct picture of the situation when he testified: "Every feature of our employment and employment conditions was directed by the War Department representatives. We were given no latitude in that regard and the War. De-

partment, we considered, was able and obligated to inform and instruct all CPFF contractors on that problem". Section 9 was, we think, intended to give relief to such wartime contractors, whose operations were run through a deluge of directives, instructions, orders, and other bureaucratic emanations.[11]

The case of Day & Zimmermann v. Reid, 8 Cir., 168 F.2d 356, upon which appellants rely, is readily distinguishable from this case. There the appellate court was not asked to upset a trial court's finding of good faith. There the claimed administrative action relied upon was a mere failure of the Ordnance Department to object to defendant's classification of an employee, —there was no positive action such as we have here. And in that case the only basis for belief that the Fair Labor Standards Act did not apply was the supposed exemption of the employee as an administrative or executive employee,—there was not, as here, any assurance that neither the War Department nor the employers considered that the Act was applicable to any of their employees, no matter what their duties.

As we find no error in the findings of the district court, the judgments are affirmed.

11. In Curtis v. McWilliams Dredging Co., City Ct., 1948, 78 N.Y.S.2d 317, page 328, dealing with similar defenses interp-sed by contractors constructing a Greenland airbase, the trial judge said: "And, indeed, what was there for the defendants to do? The plaintiffs suggest that there was an absence of good faith on the defendants' part and point to the differences of opinion that developed between the wage and hour administrator and the War Department, especially in reference to the ruling requested by the Caribbean Area Corps of Engineers. It does not appear that that ruling related to cost-plus contractors and it does appear that the Secretary of War at no time deferred to the opinion of the administrator in this respect. The testimony before me indicates nothing more than an exchange of ideas between the War Department and the administrator; and even after the issuance of the administrator's opinion in 1942, the Secretary of War in April, 1943, took a different view of the matter. As between the administrator and War Department, obviously, the defendants had to abide by the rulings of the department with which it was dealing. It could not with impunity act in defiance of those rulings. To repeat the language of the President in approving the Portal-to-Portal Act, the defendants have met 'an objective test of actual conformity with an administrative ruling or policy.' "