Gene C. McKINNEY, Plaintiff,

v.

Honorable Louis CALDERA, Secretary of the Army et al., Defendants.

No. CIV.A. 00–728 RMU.

United States District Court, District of Columbia.

March 28, 2001.

Charles William Gittins, Law Offices of Charles W. Gittens, P.C., Middletown, VA, for Plaintiff.

Scott Sutherland Harris, U.S. Attorney's Office, Washington, DC, for Defendants.

### MEMORANDUM OPINION

URBINA, District Judge.

### GRANTING THE DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

In May 1997, the United States Government charged Sergeant Major of the Army ("SMA") Gene C. McKinney, the highest ranking enlisted man in the army, with sexually harassing and assaulting six female military personnel. In 1998, after a five-week trial by court martial, SMA McKinney was convicted of one count of obstruction of justice and acquitted of eighteen sexual misconduct-related counts. Thereafter, SMA McKinney filed various petitions within the military justice system alleging that serious acts of prosecutorial misconduct—including subornation of perjury—had tainted his trial. These petitions were all denied.

Plaintiff McKinney now comes before this court charging that the Judge Advocate General of the Army ("TJAG")[1] violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et seq.*, by not adequately justifying its rejection of McKinney's request for post-trial review. The defendants in this action are the Honorable Louis Caldera, Secretary of the Army, and Major General W.B. Huffman, the Judge Advocate General, named in their official capacity. They argue that because the APA explicitly precludes judicial review of courts martial, the court must dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted. For the reasons stated herein, the court will grant the defendant's motion to dismiss.

## II. BACKGROUND[2]

On July 1, 1995, Gene C. McKinney became the first African American to hold the rank of Sergeant Major of the Army, the highest enlisted rank in the United States Army. Less than two years after

---

1. In 1924, War Department General Orders No. 2 added the capitalized "The" to the title "Judge Advocate General," hence the abbreviation "TJAG." *See* Frederic L. Borch III, *Judge Advocate "Firsts,"* 1997 Jul Army Law. 37.

2. When deciding a motion to dismiss, the court must presume the factual allegations of

SMA McKinney achieved this distinction, one of his former aides came forward with allegations that he had sexually harassed and assaulted her. A criminal investigation ensued, during which the Army identified five additional complaining witnesses, all female military personnel. On May 7, 1997, the government preferred charges against SMA McKinney, including maltreatment, assault, communication of a threat, adultery, indecent language, and obstruction of justice.

Pursuant to Article 32 of the Uniform Code of Military Justice ("UCMJ"), the Special Court–Martial Convening Authority ("SPCMCA") appointed an officer to investigate the charges against SMA McKinney. *See* 10 U.S.C. § 832.[3] The SPCMCA also ordered an Article 32 pretrial hearing, which itself became the subject of litigation when SMA McKinney and various media organizations sought to have the hearing opened to the public.[4] *See id.* On October 8, 1997, upon the close of the SPCMCA investigation, the Commander of the Military District of Washington ("MDW") referred the charges to trial by general court-martial.[5] October 8, 1997 also marked the end of Gene McKinney's tenure as Sergeant Major of the Army. On that day, the Army administratively removed SMA McKinney from his distinguished rank.

A jury trial on the merits began on February 6, 1998. After more than five weeks of testimony and argument, the jury panel—composed of at least one-third enlisted members—returned a mixed verdict. While acquitting SMA McKinney of all 18 charges related to sexual misconduct, the jury found him guilty of one count of obstruction of justice in violation of Article 134, UCMJ, 10 U.S.C. § 934.[6] SMA McKinney was sentenced to a reprimand and reduced in grade-level to Master Sergeant.

Following trial, McKinney moved for an Article 39(a) post-trial evidentiary hearing

---

a complaint to be true and construe them liberally in the plaintiff's favor. *See Shear v. Nat'l Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C.Cir.1979). Accordingly, the court derives all background information from the plaintiff's complaint, except where otherwise indicated.

3. An Article 32 Investigation is the military counterpart to the civilian grand jury. *See Morgan v. Perry,* 142 F.3d 670, 678 n. 13 (3d Cir.1998), *cert. denied sub nom. Morgan v. Cohen,* 525 U.S. 1070, 119 S.Ct. 801, 142 L.Ed.2d 662 (1999). According to the Manual for Courts Martial (MCM), United States (1995 Edition), "[t]he primary purpose of [the Article 32 Investigation] is to inquire into the truth of the matters set forth in the charges, the form of the charges, and to secure information on which to determine what disposition should be made of the case." Rules for Courts Martial 405(a), Discussion. No charge may be referred to a general court-martial for trial until an Article 32 investigation has been conducted. *See* 10 U.S.C. § 832(a).

4. After the SPCMCA ordered the pretrial hearing closed to the public, SMA McKinney and various print and broadcast media organizations filed a petition with the United States Court of Appeals for the Armed Forces seeking a Writ of Mandamus ordering the Article 32 hearing opened to the public. The Court held a hearing *ore tenus,* and ruled that a writ of mandamus should issue directing that SMA McKinney's hearing be opened to the public. *See McKinney v. Jarvis,* 47 M.J. 363 (U.S. Armed Forces 1997).

5. A general court-martial is the highest trial court in military law. *See* 10 U.S.C. § 816. Articles 22 through 29 of the UCMJ set forth the procedures for convening a court martial and determining the composition of its members. *See* 10 U.S.C. §§ 822–29.

6. The obstruction-of-justice charge related to a taped telephone conversation in which SMA McKinney was heard instructing SSG Fetrow to tell investigators that nothing ever happened between the two of them. *See Compl.,* Ex. 5 at 2.

to inquire into allegations that prosecutors had failed to disclose evidence, destroyed evidence, and attempted to influence witnesses. *See* 10 U.S.C. § 839(b). The Military Judge who presided over SMA McKinney's trial denied the motion without a hearing or oral argument. On July 27, 1998, McKinney submitted more detailed allegations of prosecutorial misconduct in the form of a declaration of Staff Sergeant ("SSG") Christina Fetrow, a prosecution witness at McKinney's court martial. According to McKinney, "the information related by SSG Fetrow provided reasonable cause to believe that the command Staff Judge Advocate and prosecutors ... engaged in a series of conscious, knowing and intentional acts of criminal and unethical conduct, including *inter alia,* commission of perjury and suborning perjury in an effort to deny evidence to former Sergeant Major of the Army McKinney." Pl.'s Opp'n to Mot. to Dismiss ("Opp'n") at 4. Notwithstanding SSG Fetrow's declaration, McKinney's renewed request for a post-trial evidentiary hearing was again denied.

McKinney then filed a petition requesting that the United States Army Court of Criminal Appeals issue a mandamus ordering the MDW Commander to convene a post-trial hearing. The Army Court of Criminal Appeals denied McKinney's petition on the merits without full briefing, and without holding a hearing or oral argument. Thereafter, on October 19, 1998, McKinney filed a Writ Appeal Petition to the United States Court of Appeals for the Armed Forces, seeking a post-trial evidentiary hearing in accordance with Rule for Court Martial ("R.C.M.") 1102. The Court of Appeals denied the Writ Appeal Petition

in a summary disposition. *See McKinney v. United States,* 51 M.J. 270 (U.S. Armed Forces 1998).

At length, the MDW Commander affirmed the findings and sentence imposed on McKinney, and forwarded the record of the trial to the Army Judge Advocate General (TJAG) for review. *See* 10 U.S.C. § 869. Under Article 69 of the UCMJ, a soldier who is convicted during a general court martial but is sentenced to less than one year of confinement receives an automatic review of the record of the trial by the Army Judge Advocate General, unless the soldier affirmatively waives review.[7] *See id.* "If any part of the findings or sentence is found to be unsupported in law or if reassessment of the sentence is appropriate, the Judge Advocate General may modify or set aside the findings or sentence or both." 10 U.S.C. § 869(a).

As part of its review, TJAG ordered Lieutenant Colonel Charles Cosgrove, a TJAG officer, to investigate McKinney's claims of prosecutorial misconduct. Under a grant of testimonial immunity, SSG Christina Fetrow testified in an *ex parte* interview with Lieutenant Colonel Cosgrove, which McKinney was not permitted to attend. Lieutenant Colonel Cosgrove also interviewed SGT Christine Roy (another prosecution witness from McKinney's court martial). During the course of her interview, for which she had not received immunity, SGT Roy "claimed the Fifth" when asked if anyone had instructed her to lie during McKinney's trial.

On October 5, 1999, after reviewing the record of the trial and the allegations of prosecutorial misconduct, TJAG denied McKinney's request to set aside the court-

---

7. In contrast, a soldier who is convicted and sentenced to one year or more is entitled to appeal the conviction to the Army Court of Criminal Appeals. *See* 10 U.S.C. § 866(b). The soldier may seek further review in the Court of Appeals for the Armed Forces, and from there, in the U.S. Supreme Court by writ of *certiorari. See id.* § 867(a). TJAG may also order review of the conviction. *See id.*

martial findings. TJAG provided no reasoning or rationale for its decision.[8] Because TJAG did not refer the case to the Army Court of Criminal Appeals, its October 1999 decision constituted a final disposition of McKinney's prosecution. *See* Mot. to Dis. at 4.

Plaintiff McKinney filed suit in this court on April 5, 2000. He contends that TJAG violated the APA because it did not provide any reasoning to support its decision, thereby preventing McKinney from determining whether his due process rights were violated. *See* Opp'n at 10–11. Such a decision, the plaintiff argues, is arbitrary, capricious, and not based on substantial evidence. The plaintiff asks the court to enter declaratory judgment that TJAG violated the APA, to set aside TJAG's decision, and to order TJAG to provide a "written final agency decision setting forth the rationale and factual basis for the conclusions of [TJAG] … in accordance with the provisions of the [APA]." *See* Compl. at 8. The defendants respond that TJAG is not an agency within the meaning of the APA, that the APA specifically precludes review of courts martial, and that this court should dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted. *See* Mot. to Dismiss; FED.R.CIV.P. 12(b)(6).

## III. DISCUSSION

### A. Legal Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests not whether the plaintiff will prevail on the merits, but rather whether the plaintiff has properly stated a claim. *See* FED.R.CIV.P. 12(b)(6); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding such a motion, the court must accept as true all well-pleaded allegations and draw all reasonable inferences in the plaintiff's favor. *See Maljack Prods. v. Motion Picture Ass'n*, 52 F.3d 373, 375 (D.C.Cir.1995).

### B. Military Justice, Courts Martial, and Federal Court Review

Federal courts must exercise special caution before undertaking review of military judgments. The United States Constitution confers on Congress the power "[t]o make rules for the Government and Regulation of the land and naval Forces." U.S. CONST. art. I., § 8, cl. 14. Pursuant to its plenary constitutional authority, Congress "has established a comprehensive internal system of justice to regulate

---

**8.** TJAG's decision in its entirety is as follows: In the general court-martial case of *United States v. Command Sergeant Major Gene C. McKinney*, 263–90–2361, U.S. Army, Headquarters and Headquarters Company, U.S. Army Garrison, Fort Myer, Virginia 22211, as promulgated in General Court Martial Order Number 11, Department of the Army, U.S. Army Military District of Washington, Washington, DC 20319–5058, the original record of trial, the promulgating order, the assignments of error, and all relevant documentation in this case have been carefully examined pursuant to Article 69(a), Uniform Code of Military Justice. The finding and sentence are supported in law and the sentence is appropriate. No modification of the finding or sentence is warranted. Action of the Judge Advocate General, Tab 6, Compl. The decision is signed by Major General Walter B. Huffman, a named defendant in this action.

military life, taking into account the special patterns that define the military structure." *Chappell v. Wallace,* 462 U.S. 296, 302, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). Military jurisprudence has evolved largely within the confines of this structure, "separate and apart" from the law that governs the federal judicial establishment. *See Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (citing *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953)). Indeed, Congress has reinforced the independence of the military justice system, having "never deemed it appropriate to confer on the [Supreme Court] 'appellate jurisdiction to supervise the administration of criminal justice in the military.'" *See Schlesinger v. Councilman,* 420 U.S. 738, 746, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) (quoting *Noyd v. Bond,* 395 U.S. 683, 694, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969)).

Integral to the military judicial structure is the Uniform Code of Military Justice (UCMJ), which governs the system of criminal justice for the Armed Forces.[9] The UCMJ provides that criminal charges against members of the Armed Forces, and certain others, must be tried before courts-martial,[10] and are subject to review by a series of military courts and officials. *See* 10 U.S.C. §§ 801–940. Once military review is complete, judgments of courts-martial are final and conclusive and binding on all courts of the United States. *See* 10 U.S.C. § 876. With one exception,[11] Congress has not granted Article III courts the authority to conduct direct review of military court decisions.

■ While federal civil courts generally are barred from conducting direct review of court-martial decisions, they do have the power to examine such decisions through collateral review. *Cf. Brown v. United States,* 365 F.Supp. 328, 332 (E.D.Pa.1973) (discussing the history of civilian-court review of military decisions and stating that "[t]he history of the limits on collateral review of court-martial convictions is a somewhat tangled web"). The most common form of collateral review of a court-martial is the writ of *habeas corpus,* which federal courts may issue when a military conviction or sentence is invalid. *See Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). In addition, many federal courts have determined that they have the authority to adjudicate collateral challenges to court-martial convictions through petitions under 28 U.S.C. § 1361 for a writ of mandamus, *see e.g. Brown,* 365 F.Supp. at 331; through actions under the Tucker Act, 28 U.S.C. § 1346, to recover pay and benefits lost as a result of discharge from service, reduction in rank, or other similar penalties imposed by a court-martial, *see id.;* and through actions for declaratory or injunctive relief, which invoke the equitable jurisdiction of the federal courts, *see Williamson v. Secretary of the Navy,* 395 F.Supp. 146, 147 (D.D.C.1975).

The plaintiff does not challenge his court-martial conviction under any of these

---

9. The UCMJ is implemented through Executive Orders of the President of the United States, pursuant to the President's authority under 10 U.S.C. § 836. The Executive Orders form a comprehensive volume of law known as the Manual for Courts Martial.

10. The Supreme Court confirmed the constitutionality of military courts martial in *Dynes v. Hoover,* 61 U.S. 65, 20 How. 65, 15 L.Ed. 838 (1857). The Court reasoned that Congress's Article I power over the military provided Congress with the authority to establish a system of military justice separate and distinct from that of Article III.

11. Title 28 U.S.C. § 1259 authorizes the United States Supreme Court to review certain decisions of the United States Court of Military Appeals on *certiorari.*

standards or even through the UCMJ. Rather, the plaintiff seeks judicial review under the APA, which provides a judicial forum for challenges to federal administrative-agency action. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Where judicial review is available, the statute authorizes the reviewing court to set aside agency action that is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law. *See* 5 U.S.C. § 706(2). Specifically, the plaintiff contends that TJAG's refusal to order a post-trial hearing was not in accordance with the APA requirement that when a written application, petition, or other request made in connection with any proceeding is denied, the agency must provide "a brief statement of grounds for denial." *See* 5 U.S.C. § 555(e).

█ A fundamental prerequisite to APA review is that the judicial challenge be to "agency" action. Accordingly, the court turns to the threshold determination of whether TJAG is an "agency" for purposes of the APA.

### C. Whether The Judge Advocate General is an Agency under the APA

#### 1. APA Definition of Agency

The APA affords a right of judicial review only to persons claiming injury as a result of "agency action." *See* 5 U.S.C. § 702. The determination as to whether

TJAG is an "agency" for the purposes of the APA appears to be a matter of first impression. That is, the court has not found, and the parties have not pointed to, any case in which a court has subjected TJAG to the requirements of the APA or held that TJAG is not and agency under the APA.[12]

"The law on the simple question of what is an agency is quite complex." *Lee Constr. Co., Inc. v. Federal Reserve Bank*, 558 F.Supp. 165, 172 (D.Md.1982) (citing 1 K. Davis, Administrative Law Treatise § 1:2 at 3 (2d ed.1978)). For most purposes, the APA defines agency to mean:

each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include-(A) the Congress; (B) the courts of the United States; (C) the government of the territories or possessions of the United States; (D) the government of the District of Columbia; or except as to the requirements of section 552 of this title-(E) agencies composed of the representatives of the parties or of representatives of organizations of the parties to the disputes determined by them; (F) *courts martial and military commissions;* (G) military authority exercised in the field in time of war or in occupied territory…

5 U.S.C. §§ 551(1) and 701(b)(1) (emphasis added).

Courts and commentators have taken various approaches to interpretation of the APA definition of "agency." For example, a number of courts have followed James

---

12. Contrary to the plaintiff's assertions, the case of *Cothran v. Dalton*, 83 F.Supp.2d 58 (D.D.C.1999), does not "make clear… [that] judicial review of courts martial is available, subject to some limitations, in the district courts." *See* Opp'n at 8–9 (emphasis omitted). Rather, the court determined that it was unnecessary to resolve the question of whether Cothran was entitled to review under the APA, reasoning that there was nothing arbitrary, capricious, or contrary to the law in TJAG's Article 69 review. *See Cothran*, 83 F.Supp.2d at 70.

Freedman's suggestion that the primary task in applying the term "agency" is to identify "centers of gravity" in the exercise of administrative power "where substantial 'powers to act' ... are vested." *See Lee Constr. Co.*, 558 F.Supp. at 172 (citing Freedman, *Administrative Procedure and the Control of Direct Foreign Investment*, 119 U. PA. L.REV. 1, 9–10 (1970)). Other courts have followed the test articulated in *Lassiter v. Guy F. Atkinson Co.*, 176 F.2d 984 (9th Cir.1949), a case addressing whether the War Department and its subdivisions were agencies of the United States within the meaning of the Portal to Portal Act. In that case, the Ninth Circuit held that "[t]he authority to act with the sanction behind it determines whether or not a governmental agency exists. The form the agency takes, or the function it performs are not determinative of the question of whether it is an agency...." *Lassiter*, 176 F.2d at 991; *see also Ellsworth Bottling Co. v. United States*, 408 F.Supp. 280, 282 (W.D.Okla.1975); *W.B. Fishburn Cleaners, Inc. v. Army & Air Force Exch. Serv.*, 374 F.Supp. 162, 164 (N.D.Tex.1974).

In the oft-cited case of *Soucie v. David*, the Court of Appeals for this Circuit considered whether the Office of Science and Technology ("OST") was an "agency" for the purposes of the APA and the Freedom of Information Act ("FOIA").[13] *See Soucie*, 448 F.2d 1067, 1073 (D.C.Cir.1971). Noting that the statutory definition of "agency" was not entirely clear, the Court held that "the APA apparently confers agency status on any administrative unit with *substantial independent authority*[14] in the exercise of specific functions." *See id.* at 1073 (emphasis added). With respect to the OST, the *Soucie* Court observed that in addition to advising the President on federal policy in areas of science and technology (in which capacity the OST might function as "merely staff to the President," *id.* at 1073), the OST was responsible for evaluating scientific research programs of various federal agencies. For this reason, the Court concluded that "[b]y virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency subject to the APA." *Id.* at 1075.

Of course, the cases do not support the proposition that the exercise of *any* independent authority converts an entity into "an authority of the Government of the United States." *See Dong*, 125 F.3d at 882. Thus, this court has held that the National Academy of Sciences ("NAS") is not an "agency" under the APA despite the fact that it possesses the authority to veto the Environmental Protection Agency's suspension of auto-emission standards. *See Lombardo v. Handler*, 397 F.Supp. 792, 794 (D.D.C.1975), *aff'd*, 546 F.2d 1043 (D.C.Cir.1976). As the court explained, the NAS is not the kind of "center of gravity in the exercise of administrative power" to which the APA refers. *See id.* at 796 (citing Freedman, 119 U. Pa. L.Rev. at 9).

---

**13.** At the time the D.C. Circuit decided *Soucie*, the definition of "agency" for purposes of FOIA was identical to the definition of "agency" as set forth in the APA. In 1974, Congress expanded FOIA's definition of "agency" to include entities "which perform governmental functions and control information of interest to the public." H.R.Rep. No. 876, 93d Cong., 2d Sess. at 8 (1974).

**14.** As the D.C. Circuit explained in a later case, the "substantial independent authority" standard derives from both the statutory language of the APA and the legislative history characterizing the type of authority required ("final and binding"). *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C.Cir.1997) (citing H.R.Rep. No.1980, 79th Cong., 2d Sess., at 19 (1946)).

Similarly, the D.C. Circuit has held that the Smithsonian, a cultural and research institution dedicated to "the increase and diffusion of knowledge among men," does not qualify as an agency under the APA. *See Dong*, 125 F.3d at 882 (citing 20 U.S.C. § 41). Even though the Smithsonian is closely linked with the federal government, receives federal funding, and publishes rules and notices in the Code of Federal Regulations, the Court determined that it is not an "agency" because it does not make binding rules of general application, determine rights and duties through adjudication, or issue orders and perform regulatory functions. *See Dong*, 125 F.3d at 880, 882; *see also Armstrong v. Executive Office of the President*, 90 F.3d 553, 558 (D.C.Cir.1996) (National Security Council is not an agency because it does not perform significant non-advisory functions, but instead serves primarily to advise the President); *Meyer v. Bush*, 981 F.2d 1288, 1297 (D.C.Cir.1993) (President's Task Force on Regulatory Relief not an agency, where members served only to report to President).

These cases underscore the need to examine the structure, function, and mandate of TJAG itself. Indeed, this Circuit has held that "any general definition [of "agency"] can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done.... The unavoidable fact is that each new arrangement must be examined anew and in its own context." *Washington Research Project, Inc. v. HEW*, 504 F.2d 238, 245–46 (D.C.Cir.1974) (citations omitted).

## 2. The Judge Advocate General's Office: Structure and Authority

█ The current statutory and regulatory scheme casts TJAG into several roles.[15] Under the United States Code, the President, with the advice and consent of the Senate, appoints the Judge Advocate General, the Assistant Judge Advocate General, and the general officers of the Judge Advocate General's Corps. *See* 10 U.S.C. § 3037(a). An officer appointed to the position of Judge Advocate General or Assistant Judge Advocate General normally holds office for four years; however, the President may terminate or extend the appointment at any time. *See id.* As set forth in the U.S.Code, TJAG supervises the system of military justice throughout the army, performs appellate review of records of trials by court martial, and furnishes the army's legal services. *See id.* TJAG also serves as the "legal adviser of the Secretary of the Army and of all officers and agencies of the Department of the Army." 10 U.S.C. § 3037(c)(1).

Significantly, one of TJAG's primary duties is to support the Secretary of the Army. The U.S.Code provides that TJAG, like the other members of the Army Staff, "shall be organized in such manner, and its members shall perform such duties and have such titles, as the Secretary may prescribe." *See* 10 U.S.C. § 3031(c). In addition, the U.S.Code states that TJAG:

**15.** The Army Office of the Judge Advocate General enjoys the historical distinction of being the oldest statutory legal position in the United States. *See* Kurt A. Johnson, *Military Department General Counsel as "Chief Legal Officers": Impact on Delivery of Impartial Legal Advice at Headquarters and in the Field*, 139 Mil. L.Rev. 1, 15 (1993). In 1775, the Second Continental Congress elected William Tudor "Judge Advocate General of the Army of the United Colonies." *See* Frederic L. Borch III, *Judge Advocate "Firsts,"* 1997 Jul Army Law. 37. One year later, the Continental Congress gave Tudor the title "Judge Advocate General" and the rank of lieutenant colonel in the new Army of the United States. *See id.*

(1) is the legal advisor of the Secretary of the Army and of all officers and agencies of the Department of the Army;

(2) shall direct the members of the Judge Advocate General's Corps in the performance of their duties; and

(3) shall receive, revise and have recorded the proceedings of courts of inquiry and military commission.

10 U.S.C. § 3037(c). The fact that TJAG's duties flow from the authority of the Secretary of the Army suggests that the core responsibility of TJAG is subordinate to the Department of the Army as a whole. The Army Regulations submitted by the plaintiff reinforce this notion. See, e.g., Army Regulation 10–5, Pl.'s Supp. Brief, Ex. 1 ("By statute, TJAG is the legal advisory to the SA [Secretary of the Army] and all officers and agencies of the DA [Department of the Army]. TJAG provides legal advice to the CSA [Chief of Staff of the Army].... TJAG directs members of the Judge Advocate General's Corps.... TJAG has staff responsibility for providing legal services to the DA, making recommendations concerning the establishment of Army legal offices, and exercising technical supervision over Army legal offices with regard to all matters in TJAG's area of responsibility").

■ On the other hand, it is true that where a party claims an exception to the general rule of reviewability under the APA, that party must demonstrate by clear and convincing evidence that Congress intended to restrict access to the courts. See Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). The case at bar is not clear-cut. Both parties have presented convincing and well-reasoned arguments. Nevertheless, in light of TJAG's subordinate position within the Department of the Army as a whole, as well as its role in the court-martial process, the court is ultimately persuaded by the defendant's position.

Indeed, with respect to TJAG's role in the court-martial process, the defendant correctly argues that "there is no colorable reason to single out Article 69 review, as opposed to the many other procedural protections built into the court martial process, as subject to scrutiny in the federal courts under the APA." Def.'s Supp. Brief at 7. For example, as the defendant notes:

before a general court martial proceeds to trial, the convening authority must refer the case to his staff judge advocate "for consideration and advice" concerning the legal and factual sufficiency of the charges. See 10 U.S.C. § 834(a). The staff judge advocate must then prepare a written statement setting forth his conclusions on these issues and a recommendation regarding future action. See 10 U.S.C. § 834(b), § 864(a). Similarly, guilty verdicts are reported promptly to the convening authority, and the accused is permitted to submit additional materials and argument to that authority for further review.

Def.'s Supp. Brief at 7–8. If the court concluded that TJAG was an agency subject to review under the APA, the court's review could potentially extend to all these other activities as well.

In the final analysis, the court will not hold that TJAG is an "agency" for the purposes of the APA because it is not clear that TJAG is vested with "substantial independent authority," and because such a ruling would fundamentally alter the relationship between the civilian and military courts, and would, in essence, defy the presumption against civilian-court review of military-court decisions.

Therefore, because the court concludes that TJAG is not an "agency" for the purposes of the APA, the court will grant the defendant's motion to dismiss.

## IV. CONCLUSION

For the foregoing reasons, the court will grant the defendant's motion to dismiss. An Order directing the parties in a manner separately and contemporaneously with this Memorandum Opinion is issued this day of March 2001.