**SELBY et al. v. J. A. JONES CONST. CO.**

No. 10788.

United States Court of Appeals
Sixth Circuit.

May 27, 1949.

Wilson, Branch & Smith and John E. Branch, Atlanta, Ga., Anderson & Snepp and Charles D. Snepp, Knoxville, Tenn., for appellants.

R. R. Kramer, Knoxville, Tenn. (Kramer, McNabb & Greenwood and Porter C. Greenwood, Knoxville, Tenn., on the brief), for appellee.

William S. Tyson, Solicitor of Labor, Bessie Margolin, Assistant Solicitor, William A. Lowe, E. Gerald Lamboley, Washington, D. C., and Beverly R. Worrell, Regional Attorney, Birmingham, Ala., on the brief, amicus curiae.

Before HICKS, Chief Judge, SIMONS and ALLEN, Circuit Judges.

HICKS, Chief Judge.

R. C. Selby and numerous other plaintiffs brought suit in the District Court under Sec. 16(b) of the Fair Labor Standards Act of 1938, Ch. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., as employees of appellee, J. A. Jones Construction Company, to recover overtime compensation, liquidated damages, attorneys' fees and costs. The court dismissed the action upon the pleadings and a stipulation of facts; hence this appeal.

In December 1941 the nation went to war. Its very existence was imperiled—the struggle was merciless. The manpower and resources of the nation were placed at its disposal. Men thought, worked, planned and hoped for victory. Scientists declared that an atomic weapon could be made; the Government set about to make it and in the course of time such a bomb was produced at a cost of more than two billion dollars. Its production was the greatest scientific achievement in the history of warfare. It was a deadly instrumentality of war and Hiroshima and Nagasaki attested its effectiveness. It quickly brought the conflict to a close.

The material facts, as stipulated, disclosed that: As a part of this effort, the Government in September 1942 began to develop the Clinton Engineering Works, commonly called Oak Ridge, which was a unit of the Manhattan District established under the War Powers Act and Executive Orders of the President to carry on research and develop an atomic bomb. The Manhattan District was under the direction of the United States Army Corps of Engineers; and the bomb was the objective.

This was a gigantic undertaking. The Oak Ridge project consisted of a site of more than seventy square miles, acquired by the United States and located along the Clinch River in Tennessee, upon which arose a great array of new plants, new residential districts and a new city, all of which were hurriedly erected and devoted directly or indirectly to the development of the bomb.

From June 1944 to January 11, 1946, appellee, a corporation operating under a contract with the United States dated May 18, 1943, was engaged in the construction, remodelling and modification of certain structures that were a part of the Clinton Engineering Works. During varying periods between the dates above mentioned, those of the appellants who were employees of appellee normally worked in excess of forty hours and were not compensated in accordance with a provision of Sec. 7 of the Fair Labor Standards Act.

Between June 1944 and March 1, 1945, certain buildings constructed by appellee under its contract were completed and turned over to the operating company, which was under contract with the United States to process materials to be used as component parts of the bomb. None of the buildings completed during this period were constructed for use directly in processing purposes but were constructed for cafeterias, dispensaries, etc.

Among other buildings erected by appellee was a large structure built and used for the processing of materials to be used as component parts or elements of the bomb. This structure was built in sections and as each section was completed it was turned over to the operating company for processing materials while the construction continued upon the uncompleted portions of the building. The first of these sections was turned over for operation in March 1945 and some of the appellants were engaged on the uncompleted sections in various non-manual duties, such as Inspector Specialists. Subsequently, certain other sections were turned over to the operating company and the processing of materials was commenced therein before all the construction work had been completed, and in such instances some of the appellant-employees re-entered such section from time to time and were engaged in various non-manual duties such as Inspector Specialists.

In certain instances, about May 2, 1945, and thereafter, appellant-employees re-entered sections of the building after it had been completed and turned over to the operating company, and after processing operations had been commenced, for the purpose of altering the construction or moving and changing machinery and equipment.

Materials to be processed by the operating company were transported to Oak Ridge, Tenn., from points beyond the State and after they had been processed were sent to destinations beyond the State. These materials before, during and after processing, remained at all times the property of the United States. The movement of the materials into the State and of the processed materials beyond the State were under the supervision and control of the Army and were at no time in the custody of a common carrier. All of the activities at Oak Ridge engaged in by appellants, appellee, the operating company and the Army, had as their legitimate object the manufacture and completion of the atomic bomb.

The structures in question, from work upon which appellants' claims are based, included "a power plant, main process plant, and certain auxiliary facilities, including installation of necessary power process and auxiliary facilities, roadways, rail connections, fences and site improvements, including utilities and construction facilities."

Appellee contends that appellants' claims are barred by Sec. 9 of the Portal-to-Portal Act, Ch. 52, Pub.Law 49, May 14, 1947, 29 U.S.C.A. § 258. This contention is made here for the first time and we think it is without merit. The stipulation fairly indicates that the activities for which appellants claim compensation were compensable by a custom or practice in effect at the time they were employed and were therefore excepted from the bar established by Sec. 2(a) and (d) of the Portal-to-Portal Act, 29 U.S.C.A. § 252(a, d). See Michigan Window Cleaning Co. v. Martino et al., 6 Cir., 173 F.2d 466. Appellants' rights to compensation for minimum wages or overtime pay falls within the scope of Sec. 9 of the Portal-to-Portal Act. Under the provisions of this section such claims are not barred unless appellee pleads and proves that its failure to pay "was in good faith in conformity with and in reliance on any administrative * * * practice or enforcement policy of any such agency with respect to the class of employers to which he belonged."

Paragraph 7 of the stipulation and the exhibits thereto show that circular letter No. 2390, dealing with the pay policy established for non-manual employees on Government cost-plus-a-fixed-fee-construction contracts was promulgated by the Chief of the Labor Relations Branch of the Construction Division of the Corps of Engineers of the War Department, and the same paragraph of the stipulation and the exhibits thereto also show that the War Department Wage Administration Agency approved the job classification, rate of pay, and pay policy of the Chief Inspector Specialists and Inspector Specialists who were employed under the contract. But appellee's difficulty admitted in its brief, is, that there is no distinct showing that these regulations, rulings and approval were relied upon by it in the establishment of the pay policy followed by it in its relation with appellants. We cannot therefore say that appellee has, upon the facts, brought itself within the provisions of Sec. 9 of the Portal-to-Portal Act.

Our remaining question is, whether appellants as employees of appellee have brought themselves within the scope of the Fair Labor Standards Act, Title 29 U.S.C.A. Ch. 8, § 206. The District Court held that the appellants were not "engaged in commerce or in the production of goods for commerce * * *," and we concur.

Under its contract with the United States, appellee was engaged in the construction, remodeling and modification of buildings and other structures to be used in carrying on research and development by the Army Corps of Engineers. The bomb was the objective. Appellants were engaged either directly or indirectly in such activities and in no other.

The commerce clause of the Constitution, Article I, Sec. 8, clause 3, vests in the Congress the power, "To regulate Commerce with foreign nations, and among the

several States and with the Indian Tribes." This clause does not undertake to regulate commerce or to define its meaning. The Fair Labor Standards Act undertakes to do both. Sec. 203(b) declares that " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." This statutory definition of commerce springs out of all that has been said on that subject by the Supreme Court since early days. We do not undertake a critical examination of all the judicial definitions of the term. We point to two of the earlier, and to one of the later, ones.

In Gibbons v. Ogden, 9 Wheat. 1, 83, 22 U.S. 1, 83, 6 L.Ed. 23, Chief Justice Marshall said:

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. * * *"

In Brown v. State of Maryland, 12 Wheat. 419, 446, 25 U.S. 419, 446, 6 L.Ed. 678, the same Chief Justice said:

"Commerce is intercourse,—one of its most ordinary ingredients is traffic,—Sale is the object of transportation and is an essential ingredient of that intercourse of which importation constitutes a part."

In Carter v. Carter Coal Co., 298 U.S. 238, 298, 56 S.Ct. 855, 867, 80 L.Ed. 1160, the court said:

"As used in the Constitution, the word 'commerce' is the equivalent of the phrase 'intercourse for the purposes of trade,' and includes transportation, purchase, sale, and exchange of commodities between the citizens of the different states. * * * In Adair v. United States, 208 U.S. 161, 177, 28 S.Ct. 277, 281, 52 L.Ed. 436, 13 Ann.Cas. 764, the phrase, 'Commerce among the several states' was defined as comprehending 'traffic, intercourse, trade, navigation, communication, the transit of persons, and the transmission of messages by telegraph,— indeed, every species of commercial intercourse among the several states.' "

To the same effect we cite, without quoting, the following cases: Welton v. State of Missouri, 91 U.S. 275, 23 L.Ed. 347; County of Mobile v. Kimball, 102 U.S. 691, 26 L.Ed. 238; Hooper v. People of State of California, 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 297; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Oklahoma v. Kansas City Nat. Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716, 35 L.R.A.,N.S, 1193; Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117, 32 A.L.R. 300; Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147; Associated Press v. N.L.R.B., 301 U. S. 103, 57 S.Ct. 650, 81 L.Ed. 953.

We are dealing with an intensely practical question, as well as an important one, and we cannot think that the bomb was an article of commerce or that the processing of materials used in its development was the equivalent of production of goods for commerce.

The term "Goods" is defined in Sec. 203(i) of the Act, but this definition does not include all goods of every kind and character. It embraces only such articles as are produced for commerce. The bomb and its component parts were developed for war and not for commerce. The fact, commonly known and judicially recognized, that it was produced secretly and in haste, negatives the idea of commercial intercourse. The use of the bomb as a weapon of war is the antithesis of the regulation of "Commerce with Foreign Nations." Such use is not intended to regulate but to destroy commerce.

It is urged that materials designed eventually to become component parts of the bomb, brought from beyond the State to Oak Ridge, there to be processed and sent to destinations beyond the State, were in the field of interstate commerce. This contention does violence to the stipulation between the parties. These materials were at all times the property of the United States and under the supervision and control of the Army, and were at no time in the custody of a common carrier. Simply stated, the Government brought its own

property, in its own possession and under its own control, to Oak Ridge and there processed it for its own use, in its own establishment, designed and constructed for that purpose by its own agents, and then sent it, for its own purposes, under its own control, beyond the State to destinations fixed by it. No element of interstate commerce was involved. There was no buying or selling of these articles, no commercial intercourse between the United States and third parties; no traffic, no market, and no ultimate consumer except the Government itself. There could be no traffic in bomb materials. None of these activities fall under the commerce clause. See The Pipe Line Cases (United States v. Ohio Oil Co.), 234 U.S. 548, 562, 34 S.Ct. 956, 58 L.Ed. 1459. We think that they were all administrative in character, engaged in by the Government in its effort, as stated in the contract, to "facilitate the prosecution of the war" and to save the country from impending peril. See N. L. R. B. v. Idaho-Maryland Mines Corp., 9 Cir., 98 F.2d 129, 131. See full discussion in Barksdale v. Ford, Bacon & Davis, Inc., D.C., 70 F.Supp. 690.

The bomb is a prodigious weapon and as a matter of policy the Government has wisely retained it for its own protection in time of war. Its components are highly dangerous elements, not to be released to commerce even in time of peace, until men have learned to control their use.

■ Appellants contend that appellee was an independent contractor and was therefore not entitled to the immunity expressly granted to the Government by Sec. 203(d) of the Act. The contention is unsound. It is stipulated that the Manhattan project, of which appellee was a unit, was administered and operated entirely under the direction of the Army, and the contract itself confirms this statement in many minute particulars. Article VII, under the heading, "Contracting Officers' Decisions" contains the following clause: "The extent and character of the work to be done by the contractor shall be subject to the general supervision, direction, control and approval of the Contracting Offi-

cer to whom the contractor shall report and be responsible."

Justice Lurton, when a Judge of the Supreme Court of Tennessee, said:

"An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, and *without being subject to control of his employer,* except as to the result of his work." (Italics ours.) Powell v. Virginia Const. Co., 88 Tenn. 692, 694, 697, 13 S.W. 691, 692, 17 Am.St.Rep. 925.

It is clear enough that appellee was not permitted under the contract to do its work in its own way and by its own methods. The cost-plus-fee arrangement indicates the contrary.

We have only one precedent involving the direct issue. We refer to the case of Young v. Kellex Corp., decided in the District Court of the Eastern District of Tennessee, January 2, 1948. The opinion is reported in 82 F.Supp. 953, and forms the basis of the decision in the case before us. Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016 does not involve the bomb or its constituent elements but it does present the same question here at issue, as it relates to munitions. The court held that munitions were neither a part of commerce nor "goods" within the meaning of the Act. The complaint was dismissed and certiorari was granted. The case was neither affirmed nor reversed and no opinion was expressed upon the merits but the judgment was vacated and the case remanded to the district court for a reconsideration and amplification of the record. The Supreme Court took the same course in Reed v. Murphey, 5 Cir., 168 F.2d 257.

Appellants lean heavily upon Bell v. Porter, 7 Cir., 159 F.2d 117 in which certiorari was denied, 330 U.S. 817, 67 S.Ct. 1092, 91 L.Ed. 1267; but the denial of certiorari is not equivalent to an affirmance. In that case the Court of Appeals held that appellant was an independent contractor and as such did not share the Government's immunity. Whether appellee here was an independent contractor is a mixed question

of law and fact, but the facts in the record are sufficient to justify the conclusion that it was not.

Judgment affirmed.