M. T. REED, T. L. Reed, Jr., Mrs. M. T. Reed, Mrs. T. L. Reed, Jr., and Mrs. S. S. Hairston, co-partners doing business as M. T. Reed Construction Company, Appellants,

v.

Eugene M. MURPHY, Jr., et al., Appellees.

No. 15521.

United States Court of Appeals Fifth Circuit.

March 16, 1956.

Sherwood W. Wise, Jackson, Miss., Charles S. Corben, New York City, for appellants.

Bessie Margolin, Asst. Solicitor, Dept. of Justice, Washington, D. C., J. W. Price, Oxford, Miss., English Lindsey, Bidwell Adam, R. W. Thompson, Jr., Gulfport, Miss., Stuart Rothman, Solicitor, Dept. of Justice, William W. Watson, Eugene R. Jackson, Attys., U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellees.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

BROWN, Circuit Judge.

A judgment awarding overtime wages, penalties and attorneys' fees under the Fair Labor Standards Act, 29 U.S.C.A. §§ 201, 216(b), against appellants, Contractor for the United States Navy under two cost-plus-fixed-fee, wartime, contracts[1] is again before us for review.[2]

Since what it did, it did under the express direction of the United States Navy, the question is whether Contractor owes the overtime with like penalties for obeying these orders. More accurately, it is whether the public Treasury shall be required to pay since the cost, including litigation expense, if imposed, is fully reimbursable, Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017. The case, which otherwise presents many complex, important additional matters of partial or complete defense not reached or passed on[3] comes down to this because, in our judgment, it turns on the good faith escape provisions of the Portal-to-Portal Act.[4]

1. The contracts were for (1) the construction of a training camp for Navy Construction Battalions ("Seabees") and a Naval Advance Base Depot at Gulfport, Mississippi, and (2) the maintenance and operation of the Advance Base Depot.

2. Brought originally by 121 plaintiffs, recovery was originally allowed for 117, but on appeal this Court reversed, 1948, 168 F.2d 257, on the basic ground that the employees were not engaged in commerce under the Act. Chief Judge Hutcheson dissented on this phase. On the plaintiffs' petition for certiorari, the Supreme Court, November 15, 1948, took action, per curiam, 335 U.S. 865, 69 S. Ct. 105, 93 L.Ed. 410:

"The petition for writ of certiorari is granted. The judgments below 168 F.2d 257 are vacated and the case remanded to the District Court with instructions to dismiss those causes of action involving solely construction work, and to reconsider the remaining causes of action in the light of the decision of this Court in Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, [92 L.Ed. 1347].

"Mr. Justice Rutledge is of the opinion that the case as a whole should be remanded to the District Court for further proceedings in view of the decision of this Court in Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031 [92 L. Ed. 1347].

"Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Murphy, dissent."

We expressly stated (168 F.2d 257, at page 262) that defendants were entitled to assert any defenses authorized by the Portal-to-Portal Act, 1947, Public Law 49, 80th Congress, 1st Session, 29 U.S. C.A. § 251, enacted subsequent to judgment in the District Court.

The retrial, under the remand, with judgment for 72 plaintiffs, was on the original record on coverage and the nature and hours of work. The new evidence produced at the hearings, December 1950, October 30, November 1, 1951, related solely to the Portal-to-Portal Act good faith defenses. The witnesses were dealing, then, in matters occurring 7½ to 8 years before.

3. These include the interpretation and application of the Supreme Court mandate, whether it foreclosed claims for all working on the "construction" contracts or merely those engaged individually in such pursuits, the evidence as to the activities, coverage and hours worked by each of the 72 plaintiffs, the status of certain employees doing work predominantly for the Navy, not the Contractor, the application to some of the administrative or professional exemption under § 13(a) (1), the calculation of the regular rate for computation of overtime, if due, and the application of the Mississippi one-year Statute of Limitation, § 731, Mississippi Code 1942. The Trial Court's opinion, findings of fact and conclusions of law, cover 217 pages, all but 14 of which are a detailed treatment as to the status, coverage, wage and hours worked by each of the individual plaintiffs.

4. Public Law 49, 80th Congress, 1st Session, 29 U.S.C.A. § 251:

"Sec. 9. Reliance on Past Administrative Rulings, etc.—In any action or proceeding commenced prior to or on or after the date of the enactment of this Act based on any act or omission prior to the date of the enactment of this Act, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads

Since the District Court held[5] this defense was not made out, we must examine the evidence in some detail. Work under the construction contract began April-May 1942 and was completed April 6, 1943. Actual operations of the Advance Base Depot under the Management and Operating Contract began July 1, 1942. Only the period from July 8, 1942, to August 1943 is involved here.

Responsibility for such construction projects was in the Bureau of Yards and Docks which, acting for the Secretary of the Navy, had the full status of an Agency of the United States, 5 U.S.C.A. § 429. The Bureau of Yards and Docks was represented by the Contracting Officer whose decision, for all practical purposes, was final.[6] As the Contractor was certainly justified in carrying out their orders, the initial inquiry relates to the actions taken by the Bureau or its plenary agent.

It simplifies the problem to start with an agreed point and work back to the beginning. On May 17, 1943, the Bureau declared, and the Contractor was advised, categorically that the Fair Labor Standards Act did not apply to Government cost-plus-fixed-fee contracts.[7]

and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect." 29 U.S.C.A. § 258.

"Sec. 11. Liquidated Damages.—In any action commenced prior to or on or after the date of the enactment of this Act to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16(b) of such Act." 29 U.S.C.A. § 260.

5. The Court held that: (1) neither Navy nor its Bureau of Yards and Docks (BYD), prior to May 11, 1943, had any ruling, policy, or practice with reference to applicability of FLSA; (2) the Contractor had no knowledge of any ruling, policy, or practice of the Navy or BYD on such matter; (3) but Contractor did know after May 17, 1943 of Wage and Hour Division interpretation that FLSA did apply; (4) Contractor never relied on any Navy, BYD, ruling, policy, or practice.

6. Except for a few trivial differences, the language is identical with that set out in the note in United States v. Wunderlich, 342 U.S. 98, 99, 72 S.Ct. 154, 96 L.Ed. 113, 115.

7. This formal ruling was precipitated by a triple inquiry concerning overtime for one employee, Nash, April 1, 1943, receipt by the Contractor of the Regional Office Wage & Hour Division's letter of March 31, 1943, asserting the employees were subject to FLSA and letters April 16, 29, 1943, concerning the claim by one of the present counsel for plaintiffs on behalf of 25 employees. On Nash, the Bureau ruled April 14, 1943, "2. * * * The Fair Labor Standards Act is not applicable to the work performed * * *." The Bureau, May 11, 1943, on the claims of the 25 employees, ruled: "2. Since the Bureau does not consider the work involved under this contract subject to the Fair Labor Standards Act, the Officer-in-Charge is advised that the Bureau will reimburse for no claim for additional compensation based upon that Act until such time as the contractor may be ordered to pay such claim by a court of competent jurisdiction. Such suits * * should be defended by the contractor * * *. The amount of any judgment * * * with * * * costs * * * and attorneys' fees, will constitute an item of cost for * * * reimbursement * * * under the contract * * *." On May 17 this was formally transmitted to Contractor.

There was nothing about that action, however, which indicated that that was the declaration of a new policy. On the contrary, it was merely the precise application of the policy long established.

 Among those testifying were former naval officers having personal knowledge of these matters both in the Bureau and on this job. Commander Goodrich, an experienced lawyer, long-time employee of the United States Department of Labor, Assistant Director of the Labor Relations Division, Bureau of Yards and Docks, who had direct and immediate responsibility for these affairs and was in continuous contact with CPFF Navy projects throughout the United States and with all of the Executive Departments, was emphatic that, from the beginning, it was the Navy's policy that these contracts were not under the Act. He had, on many occasions, relayed that policy to contacting officers, including those on this project, and had himself prepared for the Bureau's signature these letter-rulings in April-May 1943. Commander Dickeman, Officer-in-Charge and Contracting Officer June 1, 1942 through November 25, 1942, on this project, from the beginning of the war had been on construction duty and knew that a firm policy was established. He had been on duty at Pearl Harbor where he first became aware of the dispatch by Ad-miral Moreell, Chief of the Bureau, and preparatory to his taking command in Gulfport had again been advised in the Bureau's office of this policy. And, straight from the Chief himself, came irrefutable proof. On February 21, 1941, Admiral Moreell sent a dispatch to the Commandant, 14th Naval District, stating:

" * * * Dept has just received from Dept of Labor opinion that construction of Naval Air Bases in Western Pacific is not within coverage of the Fair Labor Standards Act X. Bureau interprets this to apply to all construction under fee contracts X. Comdt is authorized to proceed accordingly X."

Admiral Moreell further testified that this was his interpretation on behalf of the Bureau and was the policy followed throughout his incumbency (up through November 30, 1945) on all such contracts and, at his direction, he ordered that all CPFF contractors be so advised.[8] Moreover, this policy-practice did not rest upon the thin strand of one radiogram. It was reflected by many other contemporaneous and subsequent directives which by terms and practical operations were completely contrary to F. L. S. A.[9]

 Whatever uncertainty there might be concerning knowledge of it by

---

8. It was stipulated, "2. That Admiral Ben Moreell, if called as a *witness*, would *testify* as stated in his affidavit dated June 13, 1947, heretofore filed by the defendants with the clerk of this court in response to plaintiffs' aforesaid motion to produce. Plaintiffs, however, reserve the right to object to the competency, materiality, or relevance of such *testimony* of Admiral Moreell." (emphasis supplied) The trial court sustained plaintiffs' objection that this was hearsay and not the best evidence. This was patent error in disregard of the stipulation and without any foundation; it was not hearsay since it was within the personal knowledge of the individual, more than any other, who would know. The reservations in the stipulation meant to preserve to plaintiffs only those objections which would be available had the Admiral been on the witness stand in open court. Since the issue was the *policy* of the Bureau and not the writings, themselves, in which it might be reflected, the papers, assuming their existence, were not "best" or even "better" evidence, see Wigmore on Evidence, 3rd Ed. p. 464.

9. See e. g., Circular Letters 12–42 January 21, 1942, for so-called overtime for annual, monthly, and weekly salaried employees of CPFF Contractors for hours beyond their normal work-week (not the first 40 hours); and No. 139–43, May 27, 1943, amending No. 12–42 stating overtime in terms of hours in excess of 40 but establishing a formula which, without minimum guarantee, in fact resulted in the same pay for the normal work-week.

the Contractor, there is none concerning the Bureau's policy and practice. The evidence, with overwhelming corroboration,[10] is all one way.

We test the communication of this policy-practice to the Contractor in the general setting of the contract. This committed almost absolute rule to the Contracting Officer especially on matters requiring reimbursement. Without his approval, no cost would be repaid, and if repaid without adequate basis, a process of continuing audits assured the Government credit. The total labor cost, on this and similar projects, was of course a principal item. This in turn depended primarily on the scale of pay, the program for straight or overtime operations, and the method for determining overtime, if allowed.

On Commander Dickeman's assuming command, June 1942, as Officer-in-Charge (Contracting Officer), he immediately set about to assume his rightful responsibility. In conference soon after his arrival, on the matter of wages he informed the Contractor (both through one of the partners, Reed, and the Project Manager Schutt) of the Bureau's policy that F. L. S. A. did not apply. Both Reed and Schutt confirm the receipt of these instructions. Reed fixed it definitely right after Dickeman took over and before August-September 1942. Nothing detracted from these positive assertions except the natural inability of these witnesses eight years later to pinpoint the precise date, time, or circumstance of these conferences and detail the exact words used. The plaintiffs urged that anything so important would have been in writing, and the absence of categorical written memorandum casts substantial doubt on the truthfulness of this testimony of oral communication. This would be, of course, a left-handed way of reading into the Portal-to-Portal escape the necessity of *written* evidence, a contention universally rejected. Compare § 9 with § 10; Lassiter v. Guy F. Atkinson, 9 Cir., 176 F.2d 984, 992, 21 A.L.R.2d 1313. And it completely ignores the atmosphere of a nation struggling, through a citizen armed force, impressed suddenly into new and strange responsibilities, to arm and equip itself with the greatest possible dispatch, with economy if possible, but with waste if necessary. Decisions on every level were made and communicated with informality and time-saving shortcuts. The possibilities of losses from non-use of the normal rigid procedures for the handling of Government business was itself one of the risks of waging war. The nation's business and industrial skill had immediately to be exploited. The urgency was to get, train, equip and move men [11] to the fighting fronts.

10. E. g., defense of these suits, at Navy expense, from 1943 down to date, pursuant to the directive of May 11, 1943.

On the existence of the *policy* and *practice*, nothing contradicted the unquivocal testimony of Admiral Moreell and Commanders Goodrich and Dickeman. The court could not simply disregard this, Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 340, 53 S.Ct. 391, 77 L.Ed. 819; Foran v. Commissioner, 5 Cir., 165 F.2d 705, in the absence of contrary evidence (i. e., affirmatively showing no such policy, or some other one). Their reliability and truthfulness is in no way impugned: long since retired from the Navy, neither had any self-interest to gain or lose.

11. Commander Dickeman, pressed for explanation on the absence of written directives, testified:

"A. For the simple reason that we were at war at that time. We were in an emergency condition and our every effort was being bent toward getting work done expeditiously. That was my effort to handle routine red tape that applied under Naval circumstances and conditions of that kind. Just for instance—I reported to the Base on the 1st of June and I am quite certain in the first week I was here I get telephone calls from the Bureau that the first batch of Seabees would arrive on the 20th of June. In less than three weeks time we had to get hurriedly ready for 1100 men. Obviously

There was little opportunity for the nicer and safer procedures of peacetime. If a Squad Leader could commit his eight, a Platoon Leader his forty, a Company Commander his two hundred men to almost certain casualties by an oral command, certainly a Contracting Officer in Gulfport, Mississippi, could act by voice as well as hand.

Moreover, there is positive and overwhelming corroboration. Commander Dickeman's instructions had immediate, tangible manifestations. Establishing a Wage Board to recommend wage scales, he informed the Board that F. L. S. A. did not apply, and that the normal workweek would be 48 hours. On receipt of the Board's report and recommendation, he promulgated by formal directive [12] a wage scale and labor policy effective July 8, 1942, which, plainly contrary to F. L. S. A., if it applied, forbade overtime at all, and, in November allowed "overtime" at straight time rates.

The plaintiffs must be the last to challenge that this was done in fact,

or that it was an effective determination that F. L. S. A. did not apply, for their very claims arose because of the wage policy change established by that order. And, contemporaneously, writings made years before the Portal-to-Portal Act was passed, or its defense of good faith reliance was ever heard of, show that this directive was the means by which Commander Dickeman made the Bureau's policy on non-overtime effective.[13] Lassiter v. Guy F. Atkinson, supra, 176 F.2d at page 922; Northwest Air Lines v. Jackson, 8 Cir., 185 F.2d 74, certiorari denied 342 U.S. 812, 72 S.Ct. 26, 96 L.Ed. 614.

These decisive actions completely refute the idea implicit in the District Court's findings that prior to July 11, 1942, no discussions were had between the Contracting Officer and Contractor on the inapplicability of F. L. S. A., the matter of no overtime and the Bureau's refusal to allow it.

■ This brings it down, then, to the contention that these directives were not a sufficient declaration. It is to say

---

you couldn't be thinking about a lot of written orders under circumstances like that."

12. Directive July 11, 1942:
"1. It is directed that the Contractor adhere to the following in establishing the salaries of Navy and Contractor's employees:

"(a) A six-day workweek is to be established as of 8 July, and no overtime will be paid regardless of the number of hours worked. Where present salaries required changing they will be equitably modified, effective 8 July.

"(b) Overtime will be paid for Sunday work when properly authorized in advance. The rate of pay for overtime will be on a single time basis and *not* at a rate of time and a half.

"(c) No overtime will be paid to key men, regardless of the number of hours worked. By a key man is meant anyone who receives a salary of $75.00 or more per week."

13. December 15, 1942, Contracting Officer reported to Bureau of Yards and Docks:
"2. At the start of the construction work under subject contract, all weekly

salaried employees were compensated at the rate of time and a half for overtime performed when they worked more than 40 hours per week. Effective July 8, 1942 the then Officer-in-Charge [Dickeman] directed that no overtime would be paid to weekly salaried employees regardless of the number of hours worked except for overtime performed on Sundays, when that overtime work was authorized, for which Sunday work compensation on straight time basis would be allowed. These instructions were modified on November 6, 1942 to the extent that weekly salaried employees were to be compensated after that date on a straight time hourly rate for overtime in excess of 48 hours a week that they worked. To compensate for the fact that commencing July 8, 1942 weekly salaried employees were placed on an unlimited time basis without additional compensation for hours worked in excess of 48 hours, increases in pay were granted weekly salaried employees."

This is recopied almost verbatim in the Contracting Officer's letter April 1, 1943, to the Bureau concerning the Nash claim, see footnote 7, supra.

that for the agency action to be ground for the escape, it must have been expressed in *terms* specifically rejecting the Fair Labor Standards Act by name. We find nothing in the Portal-to-Portal Act to sustain that artificial view; and, on the contrary, find much to refute it.

Congress, by the use of the words, "any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency * * *," risked redundancy to make it certain that the availability of Governmental action as the reason for the employer's act or omission should not depend upon its form. Likewise, the last sentence of Section 9, 29 U.S.C.A. § 259, continuing the defense even though the ruling policy or practice is subsequently "determined by judicial authority to be invalid or of no legal effect" indicates that the legality of the order is altogether irrelevant. If an order naming the F. L. S. A. and giving a wrong interpretation of the Act is available as the escape, if followed, then the addition or deletion, the statement, partial or complete, of reasons underlying the order becomes quite unimportant. The order or ruling was to be judged solely in the light of its command and effect and not upon its apparent reasonableness or correctness. If the necessary consequence of the instruction was to cause a course of action either contrary to F. L. S. A. or in conflict with its requirements, then that edict amounted, at least, to an agency practice.[14]

This analysis, with the rejection, detailed above, of the trial judge's so-called fact finding that the Bureau's policy had never been orally communicated to the Contractor thus affords a dual basis for our decision. We think that the directive of July 11, 1942 (and its amendments) was all that was required. It certainly established the *practice* by the Bureau that the overtime required by F. L. S. A. would not be paid. Since it was the Bureau which set labor policies for its CPFF contractors, all that the Contractor needed to know was the decision. Whether it was wise, or unwise, was not for it. It needed to know only what it could *pay*, for that which it *could pay*, it could get back.

The good faith reliance of Contractor is not really open to question. What was it to do? Had it paid F. L. S. A. overtime, it would have violated the July 11, 1942 directive. This would have been a flagrant disobedience subjecting it to the peril of contract penalties or forfeiture. More important, the Contracting Officer's approval to the claims for payroll reimbursement, withheld because of his directive, would have left Contractor paying them out of its own funds. Whether it was mistaken or not, the Contracting Officer's act, there being no suggestion of conscious wrongdoing or fraud, was absolutely

14. Asselta v. 149 Madison Ave. Corp., D.C. S.D.N.Y., 90 F.Supp. 442; Kam Koon Wan v. E. E. Black, 9 Cir., 188 F.2d 558; Addison v. Huron Stevedoring Corp., D.C.S.D.N.Y., 96 F.Supp. 142, reversed on other grounds, 2 Cir., 204 F. 2d 88; Rogers Cartage Co. v. Reynolds, 6 Cir., 166 F.2d 317, 3 A.L.R.2d 1090; Lassiter v. Guy F. Atkinson, supra, Kenney v. Wigton-Abbott Corp., D.C. N.J., 80 F.Supp. 489; Blessing v. Hawaiian Dredging Co., D.C.D.C., 76 F.Supp. 556, 557.

The orders here directed both positive action and express prohibitions; it was no mere approval of, or acquiscence in, a payroll routinely submitted, error in classification, field examination by inspectors, or the like, cf. Glowienke v. Hawaiian Dredging Co., D.C.N.D.Ill., 84 F.Supp. 678; Bauler v. Pressed Steel Car Co., D.C.N.D.Ill., 81 F.Supp. 172; Donahue v. George A. Fuller Co., D.C. R.I., 104 F.Supp. 145; Burke v. Mesta Machine Co., D.C.W.D.Pa., 79 F.Supp. 588; Ferrer v. Waterman SS Corp., D.C. P.R., 84 F.Supp. 680; Knudsen v. Lee & Simmons, Inc., D.C.S.D.N.Y., 89 F.Supp. 400; Selby v. J. A. Jones Construction Co., 6 Cir., 175 F.2d 143; Brown v. Dunbar & Sullivan Dredging Co., 2 Cir., 189 F.2d 871; Day & Zimmermann v. Reid, 8 Cir., 168 F.2d 356.

binding, United States v. Wunderlich, supra; United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256, and the contract 30-day appeal would have been unavailing since the Bureau's policy was then and continued long to be fixed.

The plaintiffs acknowledged on argument that good faith did not require that the employer bear these costs out of its own funds. They insisted, though, that it was Contractor's duty to remonstrate with these Governmental agencies. It is absurd to say that it is the citizen who must prick the sovereign's conscience to advise it what its own law is and means. And if it had to, what was it to do? Must it have borne counsel fees for research and the inevitable and almost continuous conferences held for several years on this engaging subject by the Labor, Justice, War, Navy and other Executive Departments? Had the Contractor made his plea, what evidence is there to indicate that it would have been of any value? What reason is there to suppose that if pressed by Contractor in July 1942, the Navy Department's answer would have been any different from the April-May 1943 letters? What reason was there for the Contractor thinking, in the first place, that F. L. S. A. did apply? Certainly, there was nothing but confusion in the Executive Branch. And in the Judiciary, as late (1948) as our decision in this very case, we thought these contracts were immune. The Supreme Court avoided decision that same year, Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347, and it was not settled until 1950 by Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017.

The Contractor was entitled to look to the Navy for its instructions. The Navy gave positive directives in keeping with its general interpretive policy. The Contractor relied upon instructions which were unequivocal. If it desired to remain as Contractor, it had no alternative but to comply, and Section 9 for prior acts in contrast to Section 10 for future acts gave no preeminence to the letter from the Wage and Hour Division expressing in April 1943 a view contrary to the Navy directives, Lassiter v. Guy F. Atkinson, supra; Kam Koon Wan v. E. E. Black, supra; Addison v. Huron Stevedoring Corp., supra. Carrying out orders under such circumstances when there was nothing else to do is bound to be in good faith whether tested by the objective, Campbell v. Jones & Laughlin Steel Corp., D.C.W.D. Pa., 96 F.Supp. 189, Kam Koon Wan v. E. E. Black, supra, or a more subjective, Addison v. Huron Stevedoring Corp., supra, standard.

The defense under Section 9 was amply sustained, and it validly extinguishes all liability. Thomas v. Carnegie-Illinois Steel Corp., 3 Cir., 174 F.2d 711. The consideration of this whole record leaves us with the certain and definite impression that the trial judge's decision is not the truth and right of the case. Both by the intrinsic analysis which we have made and by the overriding impression of an injustice from the result, the fact findings and conclusions based on them will not withstand the scrutiny of F. R. C. P. 52(a), 28 U.S.C.A., and we reject them as clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Sanders v. Leech, 5 Cir., 158 F.2d 486, 487; Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217.

 Section 9 extinguishes the entire claim and makes it, strictly speaking, unnecessary to discuss Section 11, 29 U.S.C.A. § 260. Since it presents a matter closely related to Section 9, we think it appropriate to make clear that, independent of our decision on Section 9, Wolferman, Inc., v. Gustafson, 8 Cir., 169 F.2d 759; Brown v. Dunbar & Sullivan Dredging Co., supra, we would reverse and render for the appellants the judgment awarding penalties and attorneys' fees on the penalties. In contrast to Section 9 which requires

good faith reliance upon an administrative regulation, order, ruling, or practice, Section 11 demands only that the act was in good faith and that the employer had reasonable grounds for believing it was not in violation. This inquiry is committed to the "sound discretion" of the trial court, a decision which we would alter only on most compelling circumstances.

While the employer does not need the administrative ruling, policy or practice as a condition to the relief under this section, the existence of it is a factor bearing on his conduct. Surely, it is a reasonable thing for a Contractor, faced with a *fiat* forbidding the payment of overtime, to obey it when it emanates from a responsible, authoritative representative of the United States Government. And, as we have pointed out, a belief that CPFF contracts were not under F. L. S. A., while eight years and two courts later was finally held to be erroneous, certainly had "reasonable grounds." The suggestion that records were false or inaccurately kept is without any foundation. Detailed records were kept intended honestly to reflect the actual hours of work. To be sure there was a refusal to pay F. L. S. A. overtime, but it was an outright, candid position, forthrightly taken without stealth, subterfuge, or furtive machinations to make the facts appear to be something other than what they were.

We take it that the discretion under Section 11, while giving the widest latitude, yet imposes on the trial judge the duty of a reasoned, articulate judgment. To allow penalties here is to defy reason: whether the directive of July 11, 1942 was, or was not, a Section 9 ruling or practice, what could the Contractor have done in the face of it? Did he not have to obey it in fact if he were to retain the contract and was he not entitled to assume that he could place faith in the legal correctness of information coming from the branch of his Government responsible for this contract rather than some other?

The judgment is reversed and here rendered for Appellants.

Reversed and rendered.